USDC SCAN INDEX SHEET

JRL 6/10/02 8:48

3:02-CV-01096 QUECHAN INDIAN TRIBE V. USA

*1*

*CMP.*

FRANK R. JOZWIAK
MORISSET, SCHLOSSER, JOZWIAK & McGAW
Washington Bar No. 9482
801 Second Avenue
1115 Norton Building
Seattle, WA 98104-1509
Telephone: (206) 386-5200
Attorneys for Plaintiff Quechan Indian Tribe

BRYAN SNYDER
DUKE GERSTEL SHEARER, LLP
101 West Broadway, Suite 1120
San Diego, CA 92101
Telephone: (619) 232-0816
Local Counsel for Plaintiff Quechan Indian Tribe

FILED
02 JUN -7 AM 10: 27
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
DEPUTY

ORIGINAL

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUECHAN INDIAN TRIBE, a federally recognized Indian Tribe, on its own behalf, and as *parens patriae* on behalf of its members,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA; DEPARTMENT OF ENERGY; SPENCER ABRAHAM, SECRETARY OF ENERGY; WESTERN AREA POWER ADMINISTRATION; and MICHAEL S. HACSKAYLO, ADMINISTRATOR, WESTERN AREA POWER ADMINISTRATION,<br><br>Defendants. | '02 CV 01096 IEG (AJB)<br>Case No.<br><br>COMPLAINT OF QUECHAN INDIAN TRIBE FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND DAMAGES |

Plaintiff Quechan Indian Tribe alleges:

## I. SUMMARY

1. Plaintiff Quechan Indian Tribe ("Tribe"), in its own capacity and as *parens patriae* on behalf of its members, seeks declaratory and injunctive relief and damages relating to the destruction and damage of Archaeological Sites that occurred within the Tribe's Fort Yuma



LAW OFFICES
MORISSET, SCHLOSSER, JOZWIAK & McGAW
1115 NORTON BUILDING
801 SECOND AVENUE
SEATTLE, WA 98104-1509
(206) 386-5200

Reservation ("Reservation") located in Imperial County, California. As used herein, the term "Archaeological Sites" means cultural, historic, religious, and archaeological materials, objects, places, districts, and properties, whether or not listed on the National Register of Historic Places ("National Register").

## II. JURISDICTION

2. This Court has jurisdiction under the following statutes: (a) 28 U.S.C. § 1362, this being an action by an Indian tribe with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, and treaties of the United States; (b) 28 U.S.C. § 1346(b), this being an action against the United States for money damages for injury or loss of property caused by the negligent or wrongful act or omission of federal employees while acting within the scope of their office or employment; (c) 28 U.S.C. § 1331, this being an action wherein the matter in controversy exceeds $10,000.00; (d) 28 U.S.C. § 1367, this being an action that includes state law claims over which this Court has supplemental jurisdiction; (e) 28 U.S.C. § 702, this being an action that seeks declaratory relief in addition to money damages, and claims that agency actions violate standards set forth in 5 U.S.C. § 706; (f) federal archaeological protection laws, including but not limited to the National Historic Preservation Act, 16 U.S.C. §§ 470a-470w-6; and (g) 28 U.S.C. § 1361, this being an action seeking mandamus to compel federal officers, federal employees, and a federal agency to perform a duty owed to the plaintiff. Plaintiff bases its request for a declaration of rights on 28 U.S.C. § 2201 and § 2202, and for injunctive relief on the laws cited herein.

## III. VENUE

3. Pursuant to 28 U.S.C. § 1391, this action is being brought in the United States District Court for the Southern District of California, which is where a substantial part of the events or omissions giving rise to the claim occurred; and where all of the property that is the subject of the action is situated.

## IV. PLAINTIFF

4. The Quechan Indian Tribe is a federally-recognized Indian tribe with a governing body recognized by the Secretary of the Interior. The lands and resources of the Fort Yuma Reservation were reserved to the Tribe through aboriginal law and Executive Order of January 9, 1884, as modified by Executive Order of December 19, 1900, as confirmed by Secretarial Order of December 20, 1978. The Tribe sues in its own capacity, and in its capacity as *parens patriae* on behalf of its members.

5. By filing this action, the Tribe does not waive its sovereign immunity from uncontested suit, and does not consent to suit as to any claim, demand, offset, or cause of action of the United States or of any other person or entity in this or any other court.

## V. DEFENDANTS

6. Western Area Power Administration ("WAPA") is one of four hydroelectric power marketing and delivering administrations within the Department of Energy ("DOE"), which markets and transmits electricity from multi-use water projects within a 15-state region of the central and western United States. Defendant United States of America, by and through DOE and WAPA, and acting through their respective employees and agents, committed actions and omissions that destroyed and damaged Archaeological Sites within the Fort Yuma Reservation.

## VI. BACKGROUND FACTS COMMON TO ALL CLAIMS FOR RELIEF

7. Quechan tribal ancestors occupied and utilized resources of the lower Colorado River Valley for at least 10,000 years. In 1884, the federal government set aside 45,000 acres of tribal aboriginal lands for the Tribe along the Colorado River adjacent to present-day Yuma, Arizona. The boundaries of the Fort Yuma Reservation were reaffirmed by Order of the Secretary of the Interior, on December 20, 1978. The Tribe is comprised of over 4,000 members, many of whom live on the Tribe's Fort Yuma Reservation. The Reservation borders the states of Arizona, California, and Baja California in Mexico. The Tribe is unique because it is one of the few tribes that is still located within its aboriginal territory. The Tribe was not moved by the

Spaniards, Mexico, early Yuma settlers, or the United States, although the Tribe's original land base has been significantly diminished.

8. The Tribe's members still actively practice their religion and consider their religious and cultural practices to be an integral part of maintaining the health and balance of the individual, the Tribe, and the natural world. They highly value the spiritual and physical aspects of their ancestors. The Quechan Cultural Committee was established by the Tribal Council to promote, protect, and preserve Quechan culture, language, religion, history, and ancient sites and artifacts and to advise the Tribe on matters relating to such things. The Committee includes tribal elders selected to protect Quechan history, identity, and spiritual practices. The Quechan Museum exists on Indian Hill within the Fort Yuma Reservation. The goal of the museum is to protect and preserve the culture and heritage of the Tribe. Many Archaeological Sites associated with the Tribe are located both on and off the Fort Yuma Reservation. The value of the preserved, intact sites increases over time as other sites are destroyed or damaged through encroaching development and destructive activities such as off-road driving. These important sites are historically and culturally interrelated and interconnected over many miles of desert land within the Tribe's aboriginal territory. The whole of this system is greater than the sum of all its parts. Destruction or damage of any one site contributes to destruction of the whole.

9. The Quechan culture is rich in dreams, stories, dances, and complex animal pantheons. Tribal ancestors created immense geoglyphs (one-hundred-foot-long figures scraped in the desert pavement) and petroglyphs (pecked into stone), which were used during ritual pilgrimages. The Quechan people have two hundred-mile long sacred trails, spirit mountains, dance rings and "sleeping" circles (stone patterns on the ground for various purposes, including spiritual meditation and transportation). Tribal members use ancient sleeping circles today for educational purposes, as well as to meditate and conduct other spiritual practices. Tribal elders speak Quechan and have reintroduced the language to young people.

10. Since about 1942, under protest of the Tribe, the United States has held a 20.2-mile long, 125-foot wide right-of-way for a 161-kV electric power transmission line

pursuant to BLM permit No. LA0155165 (the Gila-Knob transmission line). The right-of-way contains an electric power transmission line, appurtenances, and 50-foot wide access roads. An area of approximately nine miles of the right-of-way which contains about 18 utility poles, crosses the Fort Yuma Reservation's exterior boundaries,

11. At an undetermined time, WAPA decided to replace the existing wood pole structures of the Gila-Knob transmission line with new steel H structures, using WAPA's maintenance personnel. WAPA referred to this project as the "Gila-Knob Pole 161-KV Wood Pole Rehabilitation Project" ("project").

12. In 1989, and again during the spring and summer of 1997, WAPA tested the Gila-Knob wood poles for strength and compiled a list of rejected poles in need of replacement. Only one pole located on the Fort Yuma Reservation was listed as rejected. For two poles, WAPA stated its inability to test, but noted that the poles were suspect and sounded soft. The Tribe received this testing information long after the subject incident had occurred, and only after submitting a request to WAPA under the Freedom of Information Act.

13. In 1994, WAPA requested preparation of a Class I and III cultural resource inventory along the entire 20.2 mile stretch of existing transmission line and access roads from the Gila Substation in Yuma, Arizona, to the Pilot Knob Substation, located near the Fort Yuma Reservation. The report, prepared by Western Cultural Resource Management ("WCRM"), of Boulder Colorado, is titled *Intensive Cultural Resource Inventory For the Western Area Power Administration Gila Knob 161-kV Transmission Line, Imperial County, California and Yuma County, Arizona* (April 19, 1995) ("1995 WCRM study"). The purpose of this report was to provide documentation, management recommendations, and National Register eligibility recommendations pertaining to all properties located within the right-of-way. Specifically, the 1995 WCRM study identified management-specific needs of the Archaeological Sites for their future protection during pole replacement, road maintenance, and transmission line maintenance activities.

14. The 1995 WCRM study re-confirmed that the area has high cultural significance as a former major occupation zone for the Archaeic, Patayan, and Yuman groups. Pilot Knob, a mountain located nearby, is a well-known center for traditional ceremonial activity, both past and present. The mountain peak is at the center of Quechan traditional territory and remains the focus of symbolic and sacred activities of the Tribe.

15. The 1995 WCRM study identified within the project area, among other things, various types of rare geoglyphs (often associated with spiritual and ceremonial activities); cleared circles (possibly small dance rings and/or sleeping circles); lithic scatters (which provide information about persons visiting a ceremonial area); and cobble piles (interpreted as directional markers, shrines, or raw material caches, or associated with ceremonial areas and/or trails). Archaeological evidence and ethnographic sources supported the spiritual significance of the region.

16. The project area, and most if not all of the associated Archaeological Sites, are part of a large site complex that stretches east to the edge of the terrace system overlooking the Colorado River floodplain. The 1995 WCRM study recommended that the sites within the recommended historic district for Pilot Knob be considered as contributing elements.

17. Prior to the 1995 WCRM study, 49 Archaeological Sites were known to be located within one mile of the project area, two of which are located within the project right-of-way.

18. The 1995 WCRM study identified 26 Archaeological Sites (and seven isolated finds) within WAPA's right-of-way, 20 of which lie within the Fort Yuma Reservation. Site affiliations include 24 prehistoric and/or ethnohistoric sites, one multicomponent, and one historic site. Of the 20 Archaeological Sites within the Reservation, ten were identified as eligible for listing on the National Register.

19. The 1995 WCRM study determined that the Archaeological Site boundaries were, in various cases, near, adjacent to, or overlaying the utility poles, transmission line, main right-of-way, and access roads. For some sites, the 1995 study made recommendations that

included one or more of the following: (1) that any ground disturbance be confined to the existing road cut; (2) that maintenance be restricted to the previously disturbed area around a particular utility pole; and (3) that no blading occur in a prescribed area around the utility pole unless an archaeologist was present.

20. On or about May 31, 1995, WAPA informed the Tribe and the California Office of Historic Preservation ("OAHP") that it had determined that the pole replacement project would have no effect on historic properties pursuant to Section 106 of the National Historic Preservation Act. In the letter, WAPA stated that it had surveyed all access roads should the roads need upgrading through blading, leveling, or filling. WAPA did not clearly indicate where the blading would physically occur, or that such blading would occur within the boundaries of recorded Archaeological Sites. WAPA also stated that its testing determined that a number of the wood-pole transmission line structures had deteriorated; that the process of removing and replacing poles usually resulted in no disturbance other than to the originally disturbed areas; that access would be restricted to existing access roads; and that rubber-tired vehicles would be used for all work. In its "Effects Determination and Compliance Decision," WAPA determined that the project would have no effect on historic properties; that all impacts would be restricted to previously disturbed areas; and that all eligible sites would be avoided. As "Special Conditions of Compliance," WAPA promised to ensure that all construction and maintenance activities would avoid eligible properties.

21. On or about June 26, 1995, OAHP stated that it did not object to WAPA's Effects Determination based on WAPA's representations, including its promise to restrict effects to previously disturbed areas and to avoid all eligible sites.

22. On or about the week of May 4, 1998, WAPA environmental staff reviewed the Gila-Knob alignments in order to prepare a report of findings and, among other things, to address environmental restrictions and access road issues.

23. On or about June 26, 1998, and again on July 10, 1998, WAPA listed pole-by-pole archaeological and environmental specifications for the project. For poles located on the

Reservation, specifications included, depending on the particular pole: (1) no archaeological requirements at specified sites; (2) monitoring for road maintenance and improvement (WAPA stated that monitoring meant that an archaeologist would be present); and/or (3) that no archaeologist needed to be present for pole replacement, as long as disturbance was confined to the existing roadway and a specified diameter around the structure. WAPA did not provide this information to the Tribe at that time.

24. On or about July 30, 1998, WAPA informed the Tribe and OAHP that it could no longer use only rubber-tired vehicles for all maintenance activities associated with the project, because such a restriction would severely hamper its ability to replace the structures along the transmission line. Instead, WAPA stated that it needed to use a tracked vehicle for pulling line trucks and other maintenance equipment along the currently disturbed access roads; that it would use the existing access road to bring in tracked vehicles (with blades up); and, where necessary, would pull other maintenance equipment through very sandy areas. WAPA's letter did not state that the tracked vehicle would cross sites eligible for listing on the National Register on the access roads.

25. At some time between July 30 and September 15, 1998, OAHP requested more information about WAPA's plans to use tracked vehicles instead of rubber-tired vehicles during the project.

26. On or about September 15, 1998, WAPA responded to OAHP's concerns about the tracked vehicles. WAPA stated that the tracked vehicles would be used to pull rubber-tired vehicles (e.g., pole trucks) through washes and up steep grades. WAPA listed the ten National Register-eligible sites in California across which the tracked vehicle would need to traverse, and why using the tracked vehicles would not harm the sites. WAPA stated that walking a tracked vehicle across the sites would have no effect on historic properties. WAPA did not concurrently send this letter to the Tribe. WAPA repeated in its "Recommendations" that the tracked vehicles would only walk through the sites on the existing access road, with the blade up; that the tracked vehicle would not be pulling any vehicles through the site boundaries; that the vehicles would stay

within the road prism; and that the tracked vehicles would only be used when the roads were dry. The letter also stated that the Tribe had expressed no concerns with having the tracked vehicles walk across these sites on the existing access roads, although no documentation has been identified in support of this representation.

27. On or about October 4, 1998, prior to commencing work on the project, WAPA purportedly marked some of the Archaeological Sites, or portions thereof, on the ground with flagging.

28. On or about October 5, 1998, WAPA issued a Categorical Exclusion Determination for the replacement of aged/deteriorating wood pole transmission line structures, based on 10 C.F.R. Part 1021, Subpart D, Appendix B, B4.6. WAPA thereby determined that the project would have no adverse effect on the environment and should not be considered a major federal action. One condition of the Categorical Exclusion was that monitoring would be accomplished by an archaeologist for those structures near or within eligible cultural sites. WAPA's Categorical Exclusion does not mention blading, leveling, or filling of access roads.

29. On or about October 6, 1998, WAPA modified the environmental work recommendations for many of the poles on or near eligible and noneligible sites, in all cases crossing out the requirement for on-site monitoring of work by an archaeologist, and in many crossing out the requirement that disturbance be confined to the existing roadway and a specified diameter around the structure.

30. No archaeologist or other professional monitor was present to monitor the portions of the project near or within eligible cultural sites.

31. On or about November 4, 1998, during work on the project, WAPA destroyed Archaeological Site No. 4-IMP-7140 while driving and operating equipment used to perform the work. This site, which had been recommended as eligible for inclusion in the National Register, is located near pole No. PK 18-8. The site includes a small lithic scatter with two sleeping circles. WAPA did not notify the Tribe of the damage at that time.

32. Work on the right-of-way traversing the Reservation continued through about February or March of 1999.

33. On or about February 22, 1999, a WAPA employee discovered the damage to site No. 4-IMP-7140.

34. On or about March 1, 1999, WAPA initiated an internal inquiry.

35. On or about March 2, 1999, WAPA informed one or more tribal representatives about the damage to site No. 4-IMP-7140.

36. WAPA, in subsequently investigating the damage to site No. 4-IMP-7140, revealed that it had: (1) failed to comply with directives of applicable laws and regulations protecting cultural and historical sites; (2) ignored its own assurances to provide archaeological monitoring during the project; (3) drove over and through the protected sites, destroying them; and (4) failed to notify the Tribe and others of the destruction in a timely manner.

37. On or about April 6, 1999, the Quechan Cultural Committee requested that archaeologist Jay von Werlhof investigate three other sacred sites on the Fort Yuma Reservation along the transmission line, which appeared to have been severely impacted during the same project.

38. On or about April 6, 1999, Mr. von Werlhof and the Committee's archaeological and cultural consultant, Mr. Lorey Cachora, inspected the following three additional sites within the project area, and discovered the following additional damage:

> Site No. 4-IMP-7147 WGK 12 (near power pole PK 19-4): A bulldozer had been driven through the center of the site. This site is eligible for listing on the National Register.
>
> Site No. 4-IMP-7148 WGK 13 (near power pole PK 19-2): The site suffered damage through vehicular tracks of heavy equipment miring into the desert pavement. This site is eligible for listing on the National Register.
>
> Site No. 4-IMP-7149 WGK 14 (near power pole PK 19-1): This site also suffered damage from vehicle tracks across and through cleared circles and other artifacts. This site was deemed not eligible for listing on the National Register; however, its significance to the Tribe is not affected by that decision.

39. The four known damaged sites are located within or near Sec. 14, T16S, R21W, SBM, Imperial County, California, within WAPA's right-of-way.

40. There are other Archaeological Sites located both within and outside Reservation boundaries which may also have been destroyed or damaged by WAPA's activities, but which are presently unknown to Plaintiffs.

41. In or about May 2001, WAPA retained an archaeological firm to examine the ten National Register-eligible Archaeological Sites along the transmission line. WAPA refused to include sites in the assessment that had been deemed ineligible for National Register listing in the 1995 WCRM study, despite the request of the Tribe to do so. The resulting report, issued in June 2001, determined that three sites showed no effects, six displayed minimal effects, and one had more extensive effects due to WAPA's maintenance activities, as follows:

4-IMP-7146 no effect from WAPA's activities

4-IMP-7139 no effect from WAPA's activities

4-IMP-7142 no effect from WAPA's activities

4-IMP-7143 minimal effects from WAPA's activities

4-IMP-7141 minimal effects from WAPA's activities

4-IMP-7148 minimal effects from WAPA's activities

4-IMP-689 minimal effects from WAPA's activities

4-IMP-7138 minimal effects from WAPA's activities

4-IMP-7140 more extensive effects from WAPA's activities

4-IMP-7147 minimal effects from WAPA's activities

42. WAPA's archaeologist calculated compensation to the Tribe by applying the Archaeological Resources Protection Act of 1979 ("ARPA") and its regulations. ARPA and its regulations do not account for, among other thing, injuries suffered by an Indian tribe and its members when its Archaeological Sites are damaged or destroyed.

43. All of the damaged Archaeological Sites that are the subject of this action are located within the Fort Yuma Reservation. The items and sites have been an integral part of the Tribe's culture and religion for thousands of years. The Archaeological Sites hold significant

value to the Quechan people as sacred sites and as historic treasures for teaching of the past. The Archaeological Sites contained extensive archaeologically valuable data on the region's history.

44. The damage caused by WAPA's actions is of a permanent nature. It is impossible to restore these Archaeological Sites or their features. Restoration might restore their appearance, but not their essence or function as a piece of the Tribe's past and present. The Tribe and its members are now forever precluded from using these sites as educational tools or for spiritual and cultural practices.

45. On or about February 14, 2001, the Tribe presented an administrative claim to WAPA for damages arising out of the incidents described herein in the amount of $9.4 million. (Attachment 1). By letter dated December 27, 2001, WAPA denied the Tribe's claim and advised the Tribe of its right to file suit within six months of the date the determination was mailed.

46. WAPA's actions and omissions described herein have caused the Tribe and its members to suffer direct and consequential damages that total at least $9.4 million, through: damage to its Archaeological Sites; damage to the Tribe and its members' emotional and spiritual health; loss of information about the Tribe's past; loss of potential to contribute new information to the prehistory of the lower Colorado River region; and other damages proximately caused by WAPA's actions and omissions described herein.

47. Based on available evidence and WAPA's actions and omissions described herein, the Tribe has reason to believe that the project may also have damaged Archaeological Sites (1) located within the on-Reservation portion of the right-of-way, which were not listed on the National Register; and (2) located outside the Reservation, whether listed or not. To date, WAPA has not funded a comprehensive survey of these Archaeological Sites. The Tribe seeks such a survey in the relief described herein. The Tribe also believes that WAPA's consultant understated the damage to the Archeological Sites, as described in paragraph 41. The Tribe reserves the right to amend this Complaint or to bring a separate action in the event that it becomes aware of additional actual damage.

## VII. CAUSES OF ACTION

**FIRST CLAIM: NEGLIGENCE**

Duties imposed.

48. The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-22, imposes a duty on the United States, through DOE and WAPA, to consider environmental and cultural values when assessing proposed federal projects; to consult with and fully disclose all relevant information to potentially affected Indian tribes; and to use all practicable means to improve and coordinate federal plans, functions, programs, and resources to preserve important historic, cultural, and natural aspects of the national heritage. *Id.* at 4331(b)(4).

49. The American Antiquities Act of 1906, 16 U.S.C. §§ 431-33, imposes a duty upon the United States, through DOE and WAPA, to not excavate, injure, or destroy historic or prehistoric ruins or monuments, or any objects of antiquity, situated on lands owned or controlled by the United States, without permission of the agency having jurisdiction over such lands.

50. The Archaeological and Historic Preservation Act, 16 U.S.C. §§ 469-469c-2, imposes a duty on the United States, through DOE and WAPA, to preserve historic and archaeological data.

51. The Historic Sites, Buildings and Antiquities Act, 16 U.S.C. §§ 461-67, imposes a duty on the United States, through DOE and WAPA, to preserve for public use historic sites, buildings, and objects of national significance for the inspiration and benefit of the people of the United States. *Id.* at § 461.

52. The National Historic Preservation Act, 16 U.S.C. §§ 470a-470w-6, imposes a duty on the United States, through DOE and WAPA, to foster conditions under which modern society and prehistoric and historic resources can exist in productive harmony and fulfill the social, economic, and other requirements of present and future generations; to consult with and fully disclose all relevant information to Indian tribes whose archaeological resources might be affected by a federal undertaking; to administer federally owned, administered, or controlled prehistoric resources in a spirit of stewardship for the inspiration and benefit of present and future

generations; to properly assess whether its undertaking will affect any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register; to manage and maintain properties that may be eligible for listing in the National Register in a way that considers the preservation of their historic, archaeological, and cultural values; and to, in planning, fully consider preserving properties not under federal jurisdiction but potentially affected by agency actions.

53. The Archaeological Resources Protection Act, 16 U.S.C. §§ 470aa-470mm, imposes a duty on the United States, through DOE and WAPA, to secure the protection of, and to not damage, archaeological resources and sites on public and Indian lands.

54. The Native American Graves Protection and Repatriation Act, 25 U.S.C. §§ 3001-13, imposes a duty on the United States to preserve and avoid damaging cultural resources belonging to or affiliated with Indian tribes.

55. The American Indian Religious Freedom Act ("AIRFA"), 42 U.S.C. § 1996, imposes a duty on the United States, through DOE and WAPA, to protect and preserve for American Indians their inherent right of freedom to exercise traditional religions, including access to sites, use and possession of sacred objects, and the freedom to worship through ceremonial and traditional rites.

56. Executive Order 11593, *Protection and Enhancement of the Cultural Environment* (May 13, 1971), imposes a duty on the United States, through DOE and WAPA, to administer cultural properties under its control in a spirit of stewardship and trusteeship for future generations and to direct its activities to ensure preservation of those cultural properties.

57. Various other executive orders, including the following, impose a duty on the United States, through DOE and WAPA, to fully disclose all relevant information to a tribe whose cultural resources may be affected by federal activities, and to conduct such activities with utmost care: Executive Order 13,084, *Consultation and Coordination With Indian Tribal Governments* (May 14, 1998); Presidential Memorandum, *Government to Government Relations with Native American Tribal Governments*; Executive Order 12,898 (April 29, 1994); Executive

Order 13,007, *Indian Sacred Sites* (May 24, 1996); Executive Order No. 12,898, *Federal Actions to Address Environmental Justice in Minority and Low-Income Populations* (Feb. 11, 1994).

58. DOE's own policies impose stewardship responsibilities for managing cultural resources on DOE-owned land and lands impacted by DOE programs, including the duty to preserve, protect, and perpetuate cultural resources for future generations; to fully consult with and disclose all relevant information to potentially impacted Indian tribes; to avoid unnecessary interference with religious practices; and to protect cultural resources sites and monitor unreported sites.

59. California law, to the extent that it applies in this matter, imposes analogous duties on the federal government to preserve, protect, and perpetuate cultural resources for future generations; and to avoid interfering with the free expression or exercise of Native American religion or religious sites. Cal. Pub. Resources Code § 5097.9 *et seq.* and § 15064.5; California Environmental Quality Act's Guidelines, Appendix K.

60. The federal trust responsibility to Native Americans and tribes imposes a duty on the United States to, among other things, fully consult with and disclose all relevant information to a tribe whose Archaeological Sites may be affected by activities of the United States or its agencies; to treat with the utmost care and respect, and avoid any damage to, all cultural properties affiliated with an Indian tribe, whether listed, eligible for listing, or ineligible for listing on the National Register; to immediately cease work and report to a tribe when federal activities damage a cultural site; to follow to the letter all archaeological limitations imposed on work conducted by federal agencies; and to adequately compensate a tribe and its members when federal activities result in the loss or damage of a tribe's cultural resource.

61. The Tribe's criminal code (trespass) § 13-1504 imposes duties on the United States and its agencies to not enter or remain unlawfully on the property of another; and to not burn, deface, mutilate, or otherwise desecrate a religious symbol or other religious property of another without the express permission of the owner of the property.

62. Common law imposes a duty on the United States and its agencies to properly handle and protect Archaeological Sites on federal or tribal land, particularly those affiliated with an Indian tribe; to notify a tribe of all relevant information before, during, and after ground-disturbing work occurs on or near such Archaeological Sites; and to adequately compensate a tribe for damage.

Breach of duties.

63. Defendants, through their employees and agents, breached these duties: (1) by conducting extensive land-disturbing pole replacement and blading activities on the Reservation within or near the Tribe's known Archaeological Sites, even though only one pole tested as rejected and two were suspect and sounded soft, and without informing the Tribe of such; (2) by failing to inform the Tribe where blading would physically occur, and that such blading would occur within the boundaries of recorded Archaeological Sites; (3) by using its tracked vehicles in a destructive manner that was contrary to its earlier promises; (4) by failing to have an archaeologist present for work conducted at the Archaeological Sites as promised to the Tribe and required by their own documents; (5) by failing to prepare a proper environmental analysis for the project and using its Categorical Exclusion to avoid preparing an environmental analysis for blading, leveling, and filling of access roads; (6) by failing to notify the Tribe upon the initial destruction of an Archaeological Site, and by continuing work in the same manner on or near known Archaeological Sites; (7) by refusing to survey and assess damage to other Quechan Archaeological Sites located within WAPA's right-of-way, including sites located outside of Reservation boundaries and sites not listed on the National Register; and (8) by failing to properly manage their employees and agents and thereby allowing the above incidents to occur.

Injury and damages.

64. These unlawful acts and omissions of Defendants, acting through their employees and agents, have directly, foreseeably, and proximately caused, and continue to cause, injury to Plaintiff in such sums as are set forth in Part VII of this Complaint.

**SECOND CLAIM: GROSS NEGLIGENCE**

65. The Tribe restates and incorporates by this reference the duties imposed on the Defendants described in paragraphs 48 to 62 above.

66. The Defendants, through their employees and agents, breached these duties as described in paragraph 63, in a wanton and indifferent manner constituting gross negligence.

67. These unlawful acts and omissions of the Defendants, acting through their employees and agents, have directly, foreseeably, and proximately caused, and continue to cause, injury to the Tribe as described in Part VII of this Complaint.

**THIRD CLAIM: TRESPASS**

68. The Tribe and its members own or have other legal property rights and interests in Archaeological Sites on the Reservation, including those within WAPA's right-of-way, as well as Archaeological Sites located within portions of WAPA's right-of-way that are outside of the Reservation.

69. Quechan law prohibits persons from entering or remaining unlawfully on the property of another; or burning, defacing, mutilating or otherwise desecrating a religious symbol or other religious property of another without the express permission of the owner of the property.

70. California trespass law requires persons to abstain from injuring the property of another, or infringing upon any of his rights.

71. Common law prohibits persons from intentionally entering another's property such as to interfere with the right of exclusive possession.

72. Defendants, acting through their employees and agents, unlawfully entered and destroyed or damaged the Tribe's Archaeological Sites, and committed trespass upon the Tribe's real and personal property by the actions and omissions herein described.

73. Defendants' trespass, through their employees and agents, directly, foreseeably, and proximately caused injury to the Tribe's real and personal property, as described and in such sum as is set forth in Part VII of this Complaint.

**FOURTH CLAIM: PUBLIC NUISANCE**

74. The Tribe possesses the property heretofore described.

75. A nuisance is anything that is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property. Cal. Civ. Code § 3479. A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal. *Id.* § 3480.

76. Defendants' unlawful actions and omissions, through their employees and agents, have directly, foreseeably, and proximately committed nuisance against the Tribe and its members, as well as against their property.

77. Defendants' unlawful acts and omissions have affected at the same time the entire tribal community, or any considerable number of persons of the community, although the extent of the annoyance or damage inflicted upon individuals may be unequal.

78. Defendants' actions and omissions herein described directly, foreseeably, and proximately caused injury to the Tribe's property, in such sum as is set forth in Part VII of this Complaint.

79. The Tribe has sustained certain damages not suffered by the public generally, which include, but are not limited to, the Tribe's particularized cultural connection to the Archaeological Sites described herein.

**FIFTH CLAIM: PRIVATE NUISANCE**

80. The Tribe possesses property heretofore described.

81. A nuisance is anything that is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property. Cal. Civ. Code § 3479.

82. Defendants' unlawful actions and omissions, through their employees and agents, have directly, foreseeably, and proximately committed nuisance against the Tribe and its members, as well as against their property.

83. Defendants' actions and omissions herein described directly, foreseeably, and proximately caused injury to the Tribe, its members, and their property, as described and in such sum as is set forth in Part VII of this Complaint.

**SIXTH CLAIM: CONVERSION**

84. Defendants' actions and omissions described herein, through their employees and agents, wrongfully exercised dominion or otherwise assumed authority over the Tribe's possession of its property.

85. Defendants' actions and omissions herein described directly, foreseeably, and proximately caused injury to the Tribe's property, in such manner and in such sum as is set forth in Part VII of this Complaint.

**SEVENTH CLAIM: TORTIOUS INTERFERENCE WITH PROPERTY**

86. Defendants' actions and omissions described herein, through their employees and agents, wrongfully took, detained, and exercised dominion over the Tribe's property without the Tribe's consent.

87. As such, the Tribe has been deprived of past, present, and future possession of such property.

88. As a direct, foreseeable, and proximate result of Defendants' wrongful actions and omissions, the Tribe suffered injury and damages in such manner and in such sum as is set forth in Part VII of this Complaint.

**EIGHTH CLAIM: INFLICTION OF EMOTIONAL HARM**

89. Defendants have those duties described in paragraphs 48 through 62 of this Complaint, which are restated and incorporated herein.

90. Defendants, intentionally or negligently, breached their duties described in paragraphs 48 through 62 of this Complaint.

91. As a direct, foreseeable, and proximate result of Defendants' wrongful actions and omissions, the Tribe suffered injury and damages in such manner and in such sum as is set forth in Part VII of this Complaint.

92. Defendants' acts and omissions resulted in serious distress and emotional harm to members of the Tribe, including members of the Quechan Cultural Committee, members of the elected Tribal Council, and members of the tribal community, who link their present lives and practices to the cultural, religious, and sacred practices, beliefs, and lives of their ancestors and who have been damaged by Defendants' actions and omissions.

**NINTH CLAIM: INVASION OF PRIVACY**

93. One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusions would be highly offensive to a reasonable person. Restatement 2d, Torts, § 652B.

94. Defendants' actions and omissions, as described in paragraphs 1 through 92 of this Complaint intruded upon the privacy of the Tribe and its members. Defendants knew, or should have known, that their actions and omissions would result in an intrusion. Defendants' actions and omissions were highly offensive to a reasonable person. The Tribe and its members had a reasonable expectation of privacy.

95. As a direct, foreseeable, and proximate result of Defendants' wrongful actions and omissions, the Tribe suffered injury and damages in such sum as is set forth in Part VII of this Complaint.

**TENTH CLAIM: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**

96. For the purposes of relief sought herein for other than money damages, Defendants' unlawful actions and omissions as described herein constitute agency action that violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, as: arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right; without observance of procedures required by law; unsupported by substantial evidence; and unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

**ELEVENTH CLAIM: DECLARATORY RELIEF**

97. The Tribe seeks, pursuant to 28 U.S.C. § 2201 and § 2202, a judgment declaring Defendants' actions and omissions described herein to constitute violations of federal, state, tribal and common law, as set forth herein. The relief sought in this action is essential to the preservation of the Tribe's rights, status, and other legal relations, and the Tribe has no other speedy or adequate remedy at law.

**TWELFTH CLAIM: INJUNCTIVE RELIEF**

98. Pursuant to Fed. R. Civ. P. 65 and 28 U.S.C. § 1361, the Tribe seeks a preliminary injunction and mandamus for the relief described below.

## VII. DEMAND

WHEREFORE, the Tribe requests that this Court grant the following relief:

A. Declaratory judgment against Defendants.

99. A judgment that the Defendants' actions and omissions as described herein constitute negligence, gross negligence, trespass, public nuisance, private nuisance, conversion, tortious interference with property, negligent infliction of emotional harm, and violation of the APA.

B. Injunctive relief and mandamus against Defendants.

100. An order directing Defendants to investigate and report on the extent to which its activities, including this project, have damaged Archaeological Sites along the 20.2-mile Gila-Knob transmission line, including listed, eligible and non-eligible sites.

C. Damages against Defendants.

101. The Tribe further requests that this Court issue a judgment granting the following damages against Defendants:

a. For injuries that have occurred, as described herein, damages totaling NINETY MILLION, FOUR HUNDRED THOUSAND DOLLARS ($9.4 million), to the extent that no new evidence or intervening facts becomes evident. These damages are also described and itemized in the Tribe's federal administrative claim. (Attachment 1 hereto.)

b. To the extent that the Tribe's administrative claim places a ceiling on the Tribe's damages, the Tribe limits damages to the amount stated therein.

102. The Tribe believes that the damages asserted herein are general damages, as opposed to special damages. To the extent that this Court decides that the following constitute special damages, however: (1) the amount of special damages are included in the general damage amount described herein; and (2) may include those damages as described in Paragraph 101a.

103. The Tribe seeks pre-judgment and post-judgment interest, to the extent not prohibited by law, as well as attorneys fees, costs, and expenses, and such other and further relief as the Court may deem just and equitable.

DATED this 7TH day of June, 2002.

Respectfully submitted,

MORISSET, SCHLOSSER, JOZWIAK & McGAW

By: ______________________
Frank R. Jozwiak
Washington Bar No. 9482
Attorneys for Plaintiff Quechan Indian Tribe

DUKE GERSTEL SHEARER, LLP

By: ______________________
Bryan Snyder
California State Bar No. 125212
Local Counsel for Plaintiff Quechan Indian Tribe

T:\WPDOCS\0267\09913\pleadings\complaint_006.wpd
ajd:06/03/02

LAW OFFICES
MORISSET, SCHLOSSER, AYER & JOZWIAK
A PROFESSIONAL SERVICE CORPORATION

M. FRANCES AYER (DC, GA)
JENNIFER P. HUGHES (DC, MA, NY)
FRANK R. JOZWIAK (WA)
K. ALLISON McGAW (WA)
MASON D. MORISSET (WA)
THOMAS P. SCHLOSSER (WA)

OF COUNSEL
SHARON I. HAENSLY (WA)

LEGAL ADMINISTRATOR
JEARL E. RUGH

1115 NORTON BUILDING
801 SECOND AVENUE
SEATTLE, WASHINGTON 98104-1509
FACSIMILE: (206) 386-7322
(206) 386-5200

WASHINGTON, D.C. OFFICE
1730 RHODE ISLAND AVENUE, N.W.
SUITE 209
WASHINGTON, D.C. 20036-3120
FACSIMILE: (202) 331-8738
(202) 331-8690

PLEASE REPLY TO THE
SEATTLE OFFICE

**VIA OVERNIGHT FEDERAL EXPRESS**

February 13, 2001

Honorable Spencer Abraham, Secretary
Department of Energy
Forrestal Building
1000 Independence Ave.
Washington, DC 20585-1000

The General Counsel
U.S. Department of Energy
Washington, D.C. 20585

Michael Hacskaylo, Administrator
Western Area Power Association
12155 West Alameda Parkway
Lakewood, Colorado 80228

J. Tyler Carson, Regional Manager
Western Area Power Administration
Desert Southwest Regional Office
615 South 43rd Avenue
Phoenix, Arizona 85009

Re: Quechan Indian Tribe's Administrative Claim under the Federal Tort Claims Act

Dear Addressees:

This letter and attachments constitute the administrative Claim for Damages and Injury ("Claim") of the Quechan Indian Tribe and its tribal members (collectively referred to as "the Tribe") under the Federal Tort Claims Act ("FTCA"), and incorporate all relevant information required by Standard Form 95. This letter also includes the Tribe's claim for money damages in a sum certain. We represent the claimants in this matter, and have attached a letter authorizing us to present this claim on their behalf. (Attachment A).

**ATTACHMENT 1**

By filing this claim, the Tribe does not waive its sovereign immunity from uncontested suit, and does not consent to suit as to any claim, demand, offset, or cause of action of any person or entity.

1. **NAME AND ADDRESS OF CLAIMANTS AND CLAIMANTS' PERSONAL REPRESENTATIVE**

1.1 Claimants

Quechan Indian Tribe, on its own behalf and as parens patriae on behalf of its members
Fort Yuma Indian Reservation
P.O. Box 1899
Yuma, AZ 85366-1899

Claimant reserves the right to name additional, individually named claimants.

1.2 Claimants' personal representative

Morisset, Schlosser, Ayer & Jozwiak
Frank R. Jozwiak
Attorney At Law
1115 Norton Building
801 Second Avenue
Seattle, Washington 98104-1509
(206) 386-5200
FAX: (206) 386-7322

2. **ORIGINAL DATE OF INCIDENT**

The incidents described herein all appear to have occurred during the Western Area Power Administration's ("Western") Gila-Knob Pole 161-KV Wood Pole Rehabilitation Project ("Project"), in which Western replaced deteriorating wood pole structures with new steel structures within Western's right-of-way, BLM No. LA0155165, located inside and outside of the exterior boundaries of the Fort Yuma Indian Reservation.

One incident involving harm to the Tribe's archaeological resources occurred on or about November 4, 1998. Western notified a tribal representative of the incident on or about March 2, 1999.

Other incidents involving damage to the Tribe's archaeological resources on the Fort Yuma Reservation, which appear to have occurred during the same Project, likely occurred during the time period October 1998 through project completion. Western did not notify the Tribe of this damage. The Tribe learned of this damage through other sources on or about April 6, 1999.

Based on the damage reported by Western, and the additional, unreported damage described in the above paragraph, it is highly likely that Western damaged other archaeological resources of the Tribe during the project described herein. To date, there has been no thorough investigation of archaeological damage within the entire Project site. The Tribe believes that Western should promptly undertake such an investigation. The Tribe reserves the right to file a FTCA administrative claim after such an investigation is completed and Western has notified the Tribe of any additional damage to its archaeological resources.

3. **BASES OF CLAIM**

The bases of this claim are the tortious actions and omissions of employees and agents of the United States, through the Department of Energy and the Western Area Power Administration, in destroying cultural and sacred sites located on Indian lands within the Fort Yuma Reservation.

3.1 Factual Bases of Claim

The following is primarily based on information provided by the report entitled, *Western Area Power Administration Environmental Lessons Learned Investigation Damage to Archaeological Resources During the Gila-Knob Pole Replacement* Project (April 28, 1999) (Attachment B), which is incorporated herein.

Western determined that the existing wood pole structures of the Gila-Knob transmission line should be replaced with new steel H structures, using Western's maintenance personnel. In 1994, Western requested preparation of a Class I and III cultural resource inventory along the entire approximately 20.2 mile stretch of existing transmission line from the Gila Substation in Yuma, Arizona, to the Pilot Knob Substation, located northeast of land on the Fort Yuma Reservation. Approximately 9 miles of line cross within the exterior boundaries of the Fort Yuma

Reservation. The resource inventory was carried out pursuant to Bureau of Land Management cultural permit CA-94-01-015. Archaeological sites were purportedly marked on the ground with flagging prior to the pole replacement project.

Western determined that the project would have no effect on historic properties, pursuant to section 106 of the National Historic Preservation Act, and was exempt from analysis under the National Environmental Policy Act. To support its determinations, Western promised to provide archaeological monitoring of power pole replacement efforts taking place near or within the cultural sites, and declared that cultural and historical resources would not be affected by the project. Western informed the Tribe of which sites had been recommended by Western as eligible for inclusion in the National Register of Historic Places. Western also informed the Tribe that all eligible sites would be avoided, that any impacts would be restricted to previously disturbed areas, and that it would consult the Tribe should additional impacts became necessary.

On July 30, 1998, Western notified the Tribe that it needed to use a tracked vehicle to accomplish the pole replacement project, and again assured the Tribe that there would be no effect on historic properties located on the Reservation.

Western appears to have begun work on the project sometime in October 1998. On or about November 4, 1998, Western damaged the Tribe's archaeological site no. 4-IMP-7140 WGK 4 while driving and operating the equipment used to perform the work. This site, which had been recommended as eligible for inclusion on the National Register, is located near pole no. PK 18-8. The site includes a small lithic scatter with two sleeping circles. Western informed one or more tribal representatives on or about March 2, 1999, of the damage to site no. 4-IMP-7140.

Western's investigation of the destruction of site no. 4-IMP-7140 revealed that its employees had during the project: (1) failed to comply with directives of applicable laws and regulations protecting cultural and historical resources; (2) ignored its own assurances to provide archaeological monitoring during the project; (3) failed to notify the Tribe that it was not going to avoid the sites in performing the project; (4) drove over and through the protected sites, destroying them; and (5) failed to notify the Tribe and others of the destruction in a timely manner.

On or about April 6, 1999, the Quechan Cultural Committee requested that archaeologist Jay von Werlhof investigate three other sacred sites on the Fort Yuma Reservation that appeared to have been severely impacted during the same project. On or about April 6, 1999, Mr. von Werlhof and the Committee's archaeological and cultural consultant, Mr. Lorey Cachora, visited the following three sites within the project area, and found the following damage and destruction,

as more specifically outlined in Mr. von Werlhof's report. (Attachment C). Mr. von Werlhof found the following damage:

Site no. 4-IMP-7147 WGK 12 (near power pole PK 19-4): A bulldozer had been driven through the center of the site, which is eligible for listing on the National Register.

Site no. 4-IMP-7148 WGK 13 (near power pole PK 19-2): The site suffered damage through vehicular tracks of heavy equipment miring into the desert pavement. This site is eligible for listing on the National Register.

Site no. 4-IMP-7149 WGK 14 (near power pole PK 19-1): This site also suffered damage from vehicle tracks across and through cleared circles and other artifacts. This site is eligible for listing on the National Register.

The four known sites are located within or near Sec. 14, T16S, R21W, SBM, Imperial County, California, within right-of-way BLM No. LA0155165.

3.2 Legal Bases for Claim

While replacing power poles, WAPA employees (1) failed to comply with directives of applicable laws and regulations protecting cultural resources and historical resources, including, but not limited to the California Public Resources Code, National Historic Preservation Act, American Indian Religion Freedom Act, Historic and Archeological Data Preservation Act, Archeological Resources Protection Act, National Environmental Policy Act, Archeological and Historic Preservation Act, and numerous Department of Energy and WAPA regulations, orders, and policies; (2) ignored its own assurances to provide archeological monitoring of pole replacement efforts in accordance with its Record of Categorical Exclusion Determination; (3) failed to notify the Tribe that it was not going to avoid the sites in performing the pole replacement work; (4) drove over and through protected sites with vehicles and equipment, made U-turns and circles over protected cites with vehicles and equipment, and took other negligent and intentional action to destroy the sites; and (5) failed to notify the Tribe and its own management of the destruction in some cases at all, and other cases in a timely manner.

Western had a duty to comply with applicable laws, policies and other assurances to ensure the protection of the Tribe's cultural and sacred sites throughout the pole replacement effort. Western, through these tortious and wrongful acts, violated applicable laws, policies and other assurances. These acts caused the irreparable and permanent destruction of valuable historical and sacred sites located on the Fort Yuma Indian Reservation.

The United States' liability, through its agents and employees includes, but is not limited to, the following legal theories:

3.2.1 Negligence

Western negligently: (1) damaged the Tribe's archaeological sites; (2) failed to report such damage both internally and to the Tribe; (3) failed to monitor to prevent such damage during the Project.

3.2.2 Gross Negligence

Western's acts and omission constituted gross negligence under applicable law.

3.2.3 Trespass

Western's damage to the Tribe's archaeological sites constitutes trespass of the Tribe's property.

3.2.4 Conversion

Western's damage to the Tribe's archaeological sites constitutes conversion of the Tribe's property.

3.2.5 Concealment and/or Misrepresentation

Western's failure to report damage to sites other than that located at pole 18-8 constitutes concealment and/or misrepresentation.

3.2.6 Intentional Infliction of Emotional Harm

Western's acts and omissions caused or resulted in serious distress and emotional harm to members of the Quechan Indian Tribe, including members of the Quechan Cultural Committee, members of the elected Tribal Council, and members of the tribal community who link their present lives and practices to the cultural, religious, and sacred practices, beliefs, and lives of their ancestors and who have been damaged by the actions and omissions of Western. The Tribe brings this claim on their behalf as well as on behalf of the Tribe, and reserves the right to supplement this claim with the names of individual members of the Tribe who have suffered damages resulting from Western's acts and omissions described herein.

## 4. PROPERTY DAMAGE

### 4.1 Bases of Ownership and Rights to Damages

The destroyed and/or damaged sites are located within the Fort Yuma Indian Reservation. The lands and resources of the Fort Yuma Reservation were reserved to the Quechan Indian Tribe through Executive Order of January 9, 1884, as modified by Executive Order of December 19, 1900, and confirmed by Secretarial Order of December 20, 1998. The sites have been used and relied upon by the Quechan Tribe and its members for thousands of years on a continuous basis until their destruction and damage.

### 4.2 Nature and Extent of Damage

The cultural sites are destroyed. Western drove over and through the sites with its heavy equipment and other work vehicles leaving deep tread and track marks and broke and scattered the sites and structures. Western may have damaged the sites in other ways. In most instances, there is almost no recognizable remnant of the archaeological structures.

The sites carried significant value to the Quechan people as sacred sites and as historic treasures for teaching of the past. The sites also contained extensive archeologically valuable data on the history of the area. Three of the four sites had been previously recommended by both Western and the California State Office Of Historic Preservation for listing in the National Register of Historic Places.

The damage caused by the tortious and wrongful acts and omissions of Western's employees are of a permanent nature. It is impossible to restore these destroyed features. Restoration would merely restore their appearances, not their essence or function as valuable living piece of the Tribe's past and present.

### 4.3 Total Damages Claimed

The cultural sites are destroyed, and by their nature cannot be repaired, replaced, or adequately restored. There is little recognizable remnant of the structures.

The Tribe therefore seeks compensation for the extensive, irreparable and permanent destruction of these sacred tribal sites by payment of money to the Tribe for the purpose of restoring an existing historical building on the Fort Yuma Reservation, identified as "Indian School Superintendent's Residence Building 9," to establish a first class tribal museum with

professional staff to allow the Tribe continue to protect and preserve its cultural history. These and other damages sought are itemized as follows:

| | |
|---|---|
| Restoration of Building 9 as tribal museum | $ 1,200,000.00 |
| Operation and maintenance cost for 20 years<br>(staff at $150,000/yr. X 20 = $3,000,000)<br>(maintenance @ $60,000/yr. X 20 = $1,200,000) | $ 4,200,000.00 |
| Funding for one full-time archaeologist/cultural specialist<br>($100,000/yr X 20 = $2,000,000) | $ 2,000,000.00 |
| Damages for emotional distress and outrage to Tribe and its members | $ 2,000,000.00 |
| TOTAL | $ 9,400,000.00 |

4.4 Location for Inspection

The maps included in Western's investigative report (Attachment B) show the location of destroyed archaeological site no. 4 IMP 7140, which is near power pole no. PK 18-8. Sites 4-IMP-7147, 7148, and 7149, which include power poles PK 19-4, 19-2, and 19-1, respectively, all lie within the exterior boundaries of the Fort Yuma Indian Reservation.

5. **WITNESSES**

Claimants' witnesses include:

John Holt, Desert Southwest Regional Environmental Manager
Ken Mathias, CSO Environmental Compliance Team Lead
William Koreski, Journeyman Lineman, Desert Southwest Region
Mary Barger, Western Archaeologist
Alison Jarrett, Western Environmental Specialist
Other unnamed Western employees and agents with personal knowledge of the matter, including the Project Manager, Project Foreman, and Project Crew

Chairperson, Quechan Tribe Cultural Committee
Lorey Cachora, Quechan Tribe's cultural consultant

<u>address</u>: Quechan Cultural Committee
Fort Yuma Reservation
350 Picacho Road on Indian Hill
Winterhaven, CA 92283

Ed Collins, archaeologist

<u>address</u>: Imperial Irrigation District
Environmental Compliance
2157 W. Adams Ave.
El Centro, CA 92243
Telephone: (760) 339-9834

Jay von Werlhof, archaeological consultant

<u>address</u>: Imperial Valley College
Desert Museum
P. O. Box 430
Ocotillo, CA 92259
Telephone: (760) 358-7016

Dave Snow, Preservation Specialist, Facility Design

<u>address</u>: National Park Service, Denver Service Center
P.O. Box 25287
12795 W. Alameda Parkway
Denver, CO 80225-0287
Telephone: (303) 987-6631 or (303) 969-2100

Harlan D. Unrau, Cultural Resources Specialist Planning

address: National Park Service, Denver Service Center
P.O. Box 25287
12795 W. Alameda Parkway
Denver, CO 80225-0287
Telephone: (303) 969-2100

Claimants have not interviewed or retained all witnesses, and reserve the right to later name and present expert and nonexpert witnesses who will testify on, among other things, the nature, extent, and amount of damage due to the United states' tortious acts and omissions.

I certify that the amount of claim covers only damages and injuries caused by the accident above and agree to accept said amount in full satisfaction and final settlement of this claim.

Frank R. Jozwiak — Date of claim: Feb. 13, 2001

Frank R. Jozwiak
Morisset, Schlosser, Ayer & Jozwiak
Attorney for Claimants
(206) 386-5200

6. **INSURANCE COVERAGE**

The claimant Quechan Indian Tribe carries general accident, public liability, and property insurance policies. The Tribe has not filed claims on these policies because they do not appear to cover damages caused by tortious acts of the United States.

Claimant reserves the right to supplement the information herein as names or additional information may be discovered or obtained.

Sincerely yours,

MORISSET, SCHLOSSER, AYER & JOZWIAK

Frank R. Jozwiak
Washington State Bar Association Number 09482
Attorneys for Quechan Indian Tribe

Enclosures

cc: Mike Jackson, Sr., President, Quechan Indian Tribe
Quechan Tribal Council
Douglas N. Harness, Office of General Counsel, Western Area Power Administration

T:\WPDOCS\0267\09913\abra0208.l01
ajd:02/13/01

GREAT SEAL
FT. YUMA QUECHAN INDIANS

# QUECHAN INDIAN TRIBE

*Fort Yuma Indian Reservation*

P.O. Box 1899
YUMA, ARIZONA 85366-1899
Phone (760) 572-0213
FAX (760) 572-2102

RECEIVED
DEC 0 2000
MORISSET, SCHLOSSER, AYER & JOZWIAK
SEATTLE OFFICE
[ ]OVERNIGHT [ ]USMAIL [ ]HAND DELIVERED

November 22, 2000

Frank R. Jozwiak, Esq.
Morisset, Schlosser, Ayer & Jozwiak
801 Second Avenue, Suite 1115
Seattle, Washington 98104-1509

Re: Filing of Damage Claim Against the United States Pursuant to the Federal Tort Claims Act

Dear Mr. Jozwiak:

This letter is to authorize and direct you and the law firm, on behalf of the Quechan Indian Tribe and its members, to file a damage claim pursuant to the Federal Tort Claims Act with the United States Department of Energy, Western Area Power Administration, concerning the illegal destruction of Quechan historical and sacred sites within the Fort Yuma Indian Reservation. You are further authorized and directed to file all information required by Standard Form 95, as well as other information that may be required for processing of this claim. You are hereby authorized to represent the Tribe as its attorney, under the direction and supervision of the Quechan Tribal Council.

Sincerely yours,

QUECHAN INDIAN TRIBE

Mike Jackson, Sr., President

T:\WPDOCS\0267\09913\FTCAreplet.001
clm:11/21/00

**ATTACHMENT A**

# Western Area Power Administration
# Environmental Lessons Learned Investigation
# Damage to Archeological Resources During the Gila-Knob Pole Replacement Project
# April 28, 1999

ATTACHMENT B

# Western Area Power Administration
# Environmental Lessons Learned Investigation
# Damage to Archeological Resources During the Gila-Knob Pole Replacement Project
# April 28, 1999

## 1.0 Introduction

On March 10, 1999, the Desert Southwest Regional Manager appointed a team to investigate and report upon damages done to archeological resources on Quechan Tribal land during the Gila-Knob Pole Replacement Project. The team consisted of: John Holt, Desert Southwest Regional Environmental Manager; Ken Mathias, CSO Environmental Compliance Team Lead; and William Koreski, Journeyman Lineman, Desert Southwest Region. The purpose of the team was to obtain facts regarding the situation, determine the root cause, and make recommendations that, if implemented, would prevent similar situations from occurring in the future. The team conducted its activities from March 15, 1999 to March 18, 1999. Activities included visiting the site of the damage, conducting interviews of those having knowledge of the issue, and preparing a report. This report documents the findings of the team, the root cause, and provides recommendations.

## 2.0 Authority for Investigation

The investigation was authorized by the Regional Manager, Desert Southwest Region, Western Area Power Administration. The investigation follows the general criteria of appropriate Department of Energy orders and guides (U.S. Department of Energy Order DOE O 225.1A, Accident Investigations, November 26, 1997, Attachment 2, Accident Investigation Categorization Algorithm; U.S. Department of Energy Guide G 225.1A-1, Implementation Guide For Use With DOE Order 225.1A, Accident Investigations, of November 26, 1997, Revision 1, Chapter II Application and Chapter III, Section 5.0 General Information; (Both documents authorize and guide Type C investigations). U.S. Department of Energy Order O 232.1A, Occurrence Reporting and Processing of Operations Information, of July 21, 1997, Section 4.f. (1) and 4. k. (Which categorizes the incident as an Off-Normal Occurrence, and directs an investigation be conducted, and a report submitted.)) The investigation was not classified as a Type C Investigation because it does not meet the criteria of DOE G225.1A-1, Section 2.1.4, Avoiding Undue Influence and Conflict of Interest.

## 3.0 Summary

The deteriorated condition of the Gila-Knob transmission line structures posed reliability and safety concerns. It was therefore determined the existing wood pole structures would be replaced with new steel H structures using Western's maintenance personnel. In preparation for this project, environmental and cultural resources studies were conducted. A cultural resource inventory was performed in 1995, which delineated sensitive sites within the project boundaries. These sites were marked on the ground with flagging prior to the pole replacement project. A site consisting of a lithic scatter with two sleeping circles was recorded very near transmission line structure #18-8. Structure #18-8 is located on Quechan Tribal Lands in the State of

California, Imperial County, north of Interstate 8, approximately 1.3 miles east of Knob Substation. During pole replacement work on November 4, 1998, the lithic scatter and the two sleeping circles were damaged. On February 22, 1999, the damages were found by Western and reported to Western's management. The Quechan Tribe and the California Office of Historic Preservation were informed on March 2, 1999.

**4.0 Summary of Facts**

April 19, 1995
Date of report entitled *Intensive Cultural Resource Inventory for the Western Area Power Administration Gila-Knob 161-KV Transmission Line, Imperial County California and Yuma County, Arizona*, by WCRM, contractor to Western. The report provided a cultural resource inventory at each pole structure location. A lithic scatter and two sleeping circles were described at structure #18-8.

May 31, 1995
A letter was sent from Western to Ms. Cherilyn Widell, State Historic Preservation Officer, California Office of Historic Preservation with a determination the project would have no effect on historic properties governed under Section 106 of the National Historic Preservation Act (NHPA). The letter recommended eligibility for inclusion within the National Register of Historic Places for several sites, including the site 4-IMP-7140, structure #18-8. The letter specifically stated all impacts would be restricted to previously disturbed areas, all eligible properties would be avoided, and Western construction personnel would be briefed on avoidance areas. Copy attached.

May 31, 1995
A letter was sent from Western to Mr. Fritz Brown, President of the Quechan Indian Reservation with a determination the project would have no effect on historic properties governed under Section 106 of the NHPA. The letter recommended eligibility for inclusion within the National Register of Historic Places for several sites, including the site 4-IMP-7140, structure #18-8. The letter specifically stated all impacts would be restricted to previously disturbed areas, all eligible properties would be avoided, and Western maintenance personnel would be briefed on avoidance areas. Copy attached.

June 26, 1995
A letter was received from Ms. Cherilyn Widell, State Historic Preservation Officer, California Office of Historic Preservation confirming Western's compliance with the requirements of Advisory Council on Historic Preservation regulations. The letter advised Western of additional responsibilities should certain conditions be met, including, "......if a property that was to be avoided has been inadvertently or otherwise affected in an unanticipated manner (36 CFR 800.4 (c) and 800.5)." Copy attached.

July 30, 1998 Mike Jackson
A letter was sent to Mr. Fritz Brown, President of the Quechan Indian Reservation advising him the project would have no effect on historic properties. The letter also said Western needed to use a tracked vehicle for pulling line trucks and other equipment along the currently disturbed access roads. Further, it was stated "Western has determined that there will be no effect on historic properties from using tracked vehicles." Copy attached.

August 5, 1998
A letter was sent from Western to Ms. Cherilyn Widell, State Historic Preservation Officer, California Office of Historic Preservation requesting concurrence for the use of tracked vehicles, and that such use would not impact historic properties. Copy attached.

September 3, 1998
A letter was sent from Western to Mr. Mike Jackson, Sr., Tribal President, Fort Yuma-Quechan Tribe describing the Pole Replacement Project. The letter described the project, and stated that Western had determined the proposed actions would not affect biological and cultural resources. Copy attached.

September 15, 1998
A letter was sent to Mr. Daniel Abeyta, Acting State Historic Preservation Officer, California Office of Historic Preservation, responding to their request for more information regarding the use of a tracked vehicle. Detailed information was provided to support a determination of no effect for the use of a tracked vehicle upon historic properties. Copy attached.

September 23, 1998
A letter was received from Mr. Daniel Abeyta, Deputy State Historic Preservation Officer, California Office of Historic Preservation approving the determination of no effect for the use of tracked vehicles. Copy attached.

October 4, 1998
The CSO Archeologist, DSW Environmental Specialist, DSW Project Manager, DSW Line Crew Foreman, DSW Lineman, and three DSW Equipment Operators, looked at and flagged the sensitive cultural resources sites between Knob Substation and the All American Canal. Work procedures to address preventing damage to environmental and cultural resources were discussed on site.

October 5, 1998
The Categorical Exclusion (CX) for the Gila-Knob Wood Pole Rehabilitation Project was approved. The Categorical Exclusion category applied was at 10 CFR Part 1021, Subpart D, Appendix B, B4.6. Paragraph C of the CX, Regulatory Requirements in 10 CFR 1021.410 (b), part 4 stated in part: "The proposed action has been reviewed and surveys conducted of the project area by an Archeologist and Biologist. Cultural and biological resources have been determined to not be affected. Monitoring will be accomplished by an Archeologist for those structures near or within eligible cultural sites." Copy attached.

October 6, 1998
Three to 5 copies of the written Environmental Work Recommendations were provided to the Project Manager for distribution to the appropriate line crew foremen.

Week of October 12, 1998
New steel structures were delivered to the staging area east of Knob Substation.

Week of October 19, 1998
Maintenance personnel began taking down old wood structures and erecting new steel structures

November 4, 1998
Structure #19-2 was replaced in the morning. In the afternoon structure #18-8 was replaced. The lithic scatter and the two sleeping circles were damaged by driving and operating the equipment used to perform the work. That equipment included: 90-foot Condor bucket truck; Texoma digger truck; Lorain 23-ton all-terrain crane; Telelect line truck; work and crew trucks.

February 22, 1999
A DSW Environmental Specialist discovered the damage at structure #18-8 while monitoring for desert tortoises during the wood pole disposal contract. The Environmental Specialist contacted by telephone the CSO Archeologist, a CSO Environmental Specialist, and the DSW Environmental Manager. The Environmental Manager notified the DSW Transmission Lines and Substation Maintenance Manager.

March 1, 1999
An internal inquiry was made to determine how the damage occurred. That inquiry determined the damage was done during the pole replacement operation.

March 2, 1999
Upon determination Western was responsible for the damages, The CSO Archeologist notified Pauline Owl, Chairperson of the Quechan Tribal Cultural Committee, and also notified the California Office of Historic Preservation, both by telephone.

March 3, 1999
The DSW Regional Manager was briefed on the incident, and approved conducting an investigation.

March 8, 1999
The DSW Environmental Manager, DSW Environmental Specialist, CSO Archeologist, and Lorey Cachora, Tribe Cultural Consultant, representing the Quechan Tribe, viewed the site at and near structure #18-8.

March 19, 1999
A letter to Ms. Pauline Owl, Chairperson of the Quechan Tribe Cultural Committee was sent, confirming the damage, and describing actions Western plans to investigate the issue. The letter was also copied to Mr. Chuck Whatford, California Office of Historic Preservation, and Mr. Lorey Cachora, the Quechan Tribe Cultural Consultant. Copy attached.

**5.0 Findings and Analysis**

5.1 Regulatory

Archeological resources pertinent to this investigation are regulated by the Archeological Resources Protection Act, as amended, and implemented by 43 CFR Part 7, Protection of Archaelogical Resources; the National Historic Preservation Act, as amended, and implemented by 36 CFR Parts 60, 63, 65, 78, 79, and 800; the National Environmental Policy Act, implemented by 10 CFR Part 1021; and Executive Order 11593, Protection and Enhancement of the Cultural Environment. Formal procedures for protection of cultural resources within Western Area Power Administration are provided in the *Western Area Power Administration*

*Cultural Resources Protection Manual.* Delegations of responsibility for compliance with all applicable Federal, State, local, and tribal laws and regulations are given to the Area (now Regional) Manager in Western Order WAPA 5400.1A, Environmental Considerations in the Planning, Design, Construction, and Maintenance of Power Facilities and Activities. Reporting of incidents is directed by DOE Order O 232.1A, Occurrence Reporting, and in Phoenix Area Order PA 5500, Incident Reporting, which provides for prompt notice of environmental incidents to management.

In response to those requirements, a cultural resources inventory was prepared which identified historic properties associated with the pole replacement; proper consultations were conducted with the Quechan Tribe and the California Office of Historic Preservation, and approvals were received. A Categorical Exclusion was properly prepared and approved; a copy was transmitted to the project manager by bcc. The Categorical Exclusion described the proposed action would not damage historic properties, and that "Monitoring will be accomplished by an Archeologist for those structures near or within eligible cultural sites." There is no record monitoring was accomplished. Once the damage occurred, it was not reported as required by both DOE and Phoenix Area (now Desert Southwest Region) orders. No direction was given to the project manager or crew for reporting, and it appears there was a general lack of awareness for all involved as to formal reporting requirements.

5.2 Training

Interviews revealed environmental awareness training including cultural resources training has been conducted at DSW 3 times over the past 4 years. Most recently, environmental awareness training was conducted for the craft foremen on September 2, 1998. The training included cultural resources, endangered species, and compliance requirements. The foreman of the crew replacing structure #18-8 does not recall taking that training, although he said he may have.

5.3 Decision and Direction

An on-site review of environmental sensitivities was conducted prior to the work, with several present, including the CSO Archeologist, DSW Environmental Specialist, Project Manager, Foreman, and crew members. The sensitive historic sites were toured, and decisions were made as to how to perform the pole replacement without (or minimally if absolutely necessary to do the work) impacting those sites. During the field review, the Environmental Work Recommendations for the Gila-Knob 161-kV Transmission Line Wood Pole Replacement with Steel Structures document was edited to incorporate that input. Within two days of the field review, copies were made and provided to the Project Manager, who distributed them to the crew foremen. The Foreman had one of those copies in his notebook at the time structure #18-8 was replaced. In spite of written and verbal direction, the cultural resources were damaged.

A Job Hazard Analysis was in effect for this job. The Job Hazard Analysis did not address environmentally related issues.

5.4 Responsibility

The Project Manager provided overall coordination, scheduling, and support. On-site control and direction during the work was the responsibility of the Foreman. The Foreman should also have the responsibility to ensure on-site environmental compliance. Those responsibilities were transmitted to the foreman by the Project Manager through the Environmental Work Recommendations document. There was a clear failure to follow those recommendations.

5.5 Supervision/Controls/Management

The pole replacement was done on November 4, 1998, and damages were not discovered until February 22, 1999. Although the Foreman and crew were apparently unaware of the formal requirement to report, there was still a breakdown in communication because they were known to be aware of the archeological sensitivity of the location around structure #18-8; the investigation team believes that knowing of this sensitivity, some attempt should have been made to notify maintenance or environmental management.

5.6 Inspection, inspection follow-up

Archeological monitoring was not conducted per the terms of the Categorical Exclusion. Following the pole replacement project follow-up inspection of possible environmental impacts, including archeological impacts, was not conducted.

**6.0 Causal Factors**

6.1 Direct Cause

Construction equipment driven over the resources during the Pole Replacement Project was the direct cause of damage to the archeological resources. The Project Manager and Foreman were aware of the presence of the resources through direct pre-construction briefings on site, and through written instructions. No attempt was made to avoid the resources. No attempt was made to stop the project and seek consultation regarding potential imminent damage. No attempt was made to report after the damage was done.

6.2 Root Cause

Failure to follow the requirements of the NEPA Record of Categorical Determination, specifically to do archeological monitoring for those structures near or within eligible cultural sites is the root cause for the archeological resources damage. Had the monitoring been done, damage would likely not have occurred. Archeological expertise would have been on site to assist and advise the line crew on strategies to accomplish the work with no damage or minimal damage to the archeological resources.

**7.0 Recommendations**

7.1 It is recommended procedures be established to implement the Record of Categorical Exclusion Determination. Items required to be done by the determination should be understood by all involved personnel, and procedures put in place to track and ensure their accomplishment.

7.2 It is recommended future training given to craft employees and project management involved with maintenance and construction emphasize the need to comply with laws, regulations, and directions pertaining to cultural resources. It is also recommended that personnel be made aware certain specific requirements may be demanded by National Environmental Policy Act (NEPA) documents, such as Categorical Exclusions, Environmental Assessments, and Environmental Impact Statements.

7.3 It is recommended the Environmental Work Recommendations continue to be prepared as needed, on site, jointly with project management, maintenance and environmental personnel prior to initiation of work. Pre-project strategy sessions with all involved personnel would likely help clarify environmental requirements.

7.4 It is recommended environmental hazards/work recommendations be included in the Job Hazard Analysis.

**8.0 Interview Contacts**

Assistant Regional Manager for Maintenance, DSW
Environmental Specialist, DSW
Cultural Resources Specialist, CSO
Environmental Specialist, CSO
Foreman II Lineman, DSW
Engineering Team Lead (Project Manager), DSW
Transmission Lines and Substation Maintenance Manager, DSW
Journeyman Lineman, DSW
Attorney Advisor, CSO
Environmental Specialist, CSO

**9.0 Attachments**

- Maps (3) of general vicinity and specific structure #18-8
- Photographs (6) of Pole Structure #18-8 area, before and after damage
- Archeological description of structure #18-8 vicinity
- Categorical Exclusion for Gila-Knob Wood Pole Rehabilitation Project
- Environmental Work Recommendations for the Gila-Knob 161-kV Transmission Line Wood Pole Replacement with Steel Structures, Page 16
- Letter of May 31, 1995 to the California Office of Historic Preservation
- Letter of May 31, 1995 to the President, Quechan Indian Tribe
- Letter of June 26, 1995 from the California Office of Historic Preservation
- Letter of July 30, 1998 to the President, Quechan Indian Tribe
- Letter of August 5, 1998 to the California Office of Historic Preservation
- Letter of September 3, 1998 to the President, Fort Yuma-Quechan Tribe
- Letter of September 15, 1998 to the California Office of Historic Preservation
- Letter of September 23, 1998 from the California Office of Historic Preservation
- Letter of March 19, 1999 to the Chairperson, Cultural Committee, Quechan Tribe

Prepared and Submitted by:

__________ Date ____ John Holt, Team Lead

__________ Date ____ Ken Mathias, PE, REM, CEA

__________ Date ____ William Koreski, Journeyman Lineman

State of California – The Resources Agency
DEPARTMENT OF PARKS AND RECREATION

ARCHEOLOGICAL SITE LOCATION MAP

Page 5 of 13.

Permanent Trinomial: 4-IMP-7158 ___ / ___ Mo. Yr.

Other Designations: ___






Figure 5.7. 4-IMP-7140 site map.



Photo 1: View to Northwest of Structure #18-8 After Damage



Photo 2: View to North of Structure #18-8 After Damage



Photo 3: View to South of Structure #18-8 Showing Damage to North Sleeping Circle (Center)



Photo 4: Damage to North Sleeping Circle (Center of Circle is Flagged)



Photo 5: Damage to South Sleeping Circle (Center of Circle is Flagged)



WGK 4. Cleared Circle.

Photo 6: South Sleeping Circle Prior to Damage

**4-IMP-7140** (Figure 5.7)

Site Type: Lithic scatter with features

Affiliation: Unknown Prehistoric

Site Function: Lithic procurement and reduction; temporary camp

Location: SE ¼ SW ¼ SE ¼; T16S, R21E Section 14

Land Status: Quechan Indian Tribe

This site is located 1.3 miles east of the Pilot Knob substation. The site is along the access road and within the transmission line ROW at structure PK 18-8. Pilot Knob is approximately 2 miles south and the Cargo Muchacho Mountains are 2.5 miles north of the project area. Current disturbance to the site is confined to a 10 m (33 ft) diameter surrounding structure PK 18-8. An unbladed access road leads to the structure along the eastern edge of the site. The access road is represented by a two-track road and has introduced minimal damage to the site. It is recommended that future access be confined to the existing two-track road and maintenance activities be restricted to the previously disturbed area around the structure. It is further recommended that no blading occurs from 102 m (335 ft) north to 17 m (55 ft) south of the structure unless an archaeologist is present.

Site 4-IMP-7140 is a 95 m (312 ft) N/S by 15 m (49 ft) E/W sparse lithic scatter with two cleared circles. The site is situated on top of a narrow eroded ridge mantled by desert pavement. Quartz, chert, and quartzite are represented among the 19 pieces of chipped stone dispersed across the site. Artifact types among the assemblage include 1 tested cobble, 2 cobble cores, 3 prepared cores, 5 primary flakes, 3 secondary flakes, and 5 fragments of angular debris. Among the 19 flaked artifacts 6 exhibit heavy varnish, 2 have moderate varnish, and the remaining 11 artifacts are not varnished.

Site 4-IMP-7140 contains two cleared circles (Features 1 and 2). Feature 1 is located approximately 10 m (33 ft) south of structure PK 18-8 in the southern end of this elongated site. Feature 1 is a 2.1 m (6.9 ft) diameter circle. Feature 2 is 11 m (36 ft) north of the structure and is a 1.8 m (5.9 ft) diameter circle. Both circles are defined by the central exposure of fine silt and well-varnished gravel berms.

Vegetation is sparse and consists of creosote bushes, ocotillo, mesquite, and scattered patches of grass on the site. Palo verde and ironwood are common in the adjacent washes.

Based on ethnographic documentation (see Chapter 3), personal communication with Quechan tribal members, and the visible characteristics of the cultural landscape, this site is probably part of a larger site complex composed of sites 4-IMP-7137 through 7145, 7146-7150, and 7151-7157. The complex stretches approximately three miles east to the edge

of the terrace system overlooking the Colorado River floodplain. The presence of chipped stone artifacts exhibiting varying levels of desert varnish and the initial stages of reduction in association with the cleared circles suggests the site may have functioned as a temporary camp.

Raw material procurement was an important activity along the lower Colorado River terraces. Although, diagnostics are lacking and the resources are located on desert pavement unlikely to have depth, variation in the development of artifact and feature varnish provides the potential for future chronometric studies. Specifically, cation-ratio dating has been used experimentally to date desert varnish. As the development of this technique continues to advance, a cross sample of sites will be necessary to develop a regional curve. 4-IMP-7140 has the potential to contribute significant new information about the prehistory of the lower Colorado River region and is recommended eligible for the NRHP under criterion (d).

G0440 (Jarrett)

EFG (07-90)

United States Government Department of Energy

# memorandum

DATE: OCT -6 1998

REPLY TO ATTN OF: G0440 (Jarrett)

SUBJECT: Categorical Exclusion for Gila-Knob Wood Pole Rehabilitation Project.

TO: B. Karsell, A3400, Golden, CO

Western has determined that the replacement of wooden structures with light-duty steel structures on the Gila-Knob 161 kV Transmission Line will have no adverse affect and should not be considered a major Federal action. Attached is a copy of the completed Categorical Exclusion

John R. Holt
John R. Holt
Environmental Manager

Attachment

# RECORD OF CATEGORICAL EXCLUSION DETERMINATION

A. Proposed Action: Western Area Power Administration (Western) is replacing aged/deteriorating wood pole transmission line structures on the Gila-Knob 161 kV transmission line. These wooden H-frame structures will be replaced with light-duty steel H-frame structures. Newer wooden structures may also be replaced with light-duty steel structures or may be rebuilt with reused wooden poles. Proposed begin date is beginning fiscal year 1999.

B. Categorical Exclusion Applied: 10 CFR, Part 1021, Subpart D, Appendix B, B4.6: "Additions or modifications to electric power transmission facilities that would not affect the environment beyond the previously developed facility area including, but not limited to, switchyard rock grounding upgrades, secondary containment projects, paving projects, seismic upgrading, tower modifications, changing insulators, and replacement of poles, circuit breakers, conductors, transformers, and crossarms."

C. Regulatory Requirements in 10 CFR 1021.410 (b):

1. The proposed action fits within a class of actions that is listed in Appendix B to Subpart D.

   1. The proposed action has been reviewed for the requirements of the Endangered Species Act, the National Environmental Policy Act, the National Historic Preservation Act and all applicable Department of Energy Orders.

   2. The proposed action is the replacement of aged/deteriorating wood pole transmission line structures with light-duty steel structures and does not involve the siting, construction, or expansion of waste storage, disposal, recovery, or treatment facilities.

   3. The proposed action is generating expended wooden poles and crossarms which may have been treated with pentachlorophenol, creosote, or other hazardous wood preservative. A contract is in place for the legal and proper handling and disposal of these items.

   4. The proposed action has been reviewed and surveys conducted of the project area by an Archaeologist and Biologist. Cultural and biological resources have been determined to not be affected. Monitoring will be accomplished by an Archaeologist for those structures near or within eligible cultural sites. U.S. Fish and Wildlife along with the California and Arizona State Historic Preservation Officers have concurred with the recommendations for this project provided them.

2. There are no extraordinary circumstances related to the proposal that may affect the significance of the environmental effects of the proposal; and

3. The proposal is not "connected" to other actions with potentially significant impacts, is not related to other proposed actions with cumulatively significant impacts, and is not precluded by 40 CFR 1506.1 or 10 CFR 1021.211.

**D. Determination:**
Based on my review of information conveyed to me and in my possession concerning the proposed action, as NEPA Compliance Officer (as authorized under DOE Order 451.1A), I have determined that the proposed action fits within the specified class of actions, the other regulatory requirements set forth above are met, and the proposed action is hereby categorically excluded from further NEPA review.

John R. Holt
John R. Holt
NEPA Compliance Officer

10-5-98
Date

| | |
|---|---|
| | ***MONITORING AND TESTING MEANS THAT AN ARCHAEOLOGIST MUST BE PRESENT***ALL SAGUARO CACTUS WILL BE AVOIDED***BARREL CACTUS WILL BE RELOCATED WITHIN THE ROW AND HEDGEHOG CACTUS WILL BE RELOCATED WHEN POSSIBLE |
| 18-6 | No need for road improvements. Work on northside of roadway. AVOID southside of roadway. Requires Monitoring for road maintenance and improvements, and brush-hogging. Archaeologist does not need to be present for pole replacement, as long as disturbance is confined to existing roadway and 33 foot diameter around structure. Track-vehicles may travel through the site on existing DRY roadways. |
| 18-7 | Remain on currently disturbed roadway. DO NOT CROSS undisturbed areas. Requires Monitoring for road maintenance and improvements, and brush-hogging. Archaeologist does not need to be present for pole replacement, as long as disturbance is confined to existing roadway and pad around structure. Track-vehicles may travel through the site on existing DRY roadways. |
| 18-8 | Two sleeping circles. Okay to carefully drive over northern sleeping circle. Avoid southern sleeping circle. Both are marked with flagging tape. ACCESS from the EAST ONLY on existing two-track roadway. Requires Monitoring for road maintenance and improvements, and brush-hogging. Archaeologist does not need to be present for pole replacement, as long as disturbance is confined to existing roadway and 33 foot diameter around structure. Track-vehicles may travel through the site on existing DRY roadways. |
| 18-9 | |

60 of 98
10/2/08

Ms. Cherilyn Widell
Office of Historic Preservation
Department of Parks and Recreation
P.O. Box 942896
Sacramento, CA 94296-0001

Dear Ms. Widell:

Western Area Power Administration (Western) has considered the effects of the Gila-Knob 161-kV Wood-Pole Transmission Line replacement project on cultural resources. Per 36 CFR 800.5, Western has determined that the undertaking will have no effect on historic properties. The submission of this documentation fulfills Western's responsibilities under Section 106 of the National Historic Preservation Act.

**I. Description of the Undertaking:**

The proposed undertaking is the replacement of identified poles on the Gila-Knob 161-kV Wood-Pole Structure Transmission Line. This line is over 50 years old. The transmission line is 20.2 miles long and is located in Yuma County, Arizona, and Imperial County, California (see enclosed report).

A wood-pole testing program conducted for the transmission line determined that a number of the wood-pole transmission line structures have deteriorated and no longer have structural integrity (strength) or they are not fit to climb due to shell rot and surface cracking. The transmission line structures cannot be maintained if the wood-poles cannot be climbed. Therefore, Western plans to replace the deteriorated wood-poles.

The process of removing and replacing wood-pole transmission line structures usually results in no disturbances other than the areas originally disturbed when the line was constructed. In most cases, the wood-poles can be directly pulled from the ground, and the new pole put back into the same hole.

Access for this project will be restricted to existing access roads. Rubber-tired vehicles will be used for all work. All access roads were also surveyed should the road need upgrading through blading, leveling or filling.

**II. Methodology and Reporting:**

A search of the existing records for the area was conducted at the Arizona State Museum, affected Bureau of Land Management (BLM) offices and the Eastern Information Center, University of California, Riverside. The file searches indicated that there were 49 previously recorded sites within one mile of the transmission line and two were located within the right-of-way.

A 100 percent cultural resources inventory was conducted of the right-of-way and all access roads. The right-of-way consisted of a 125 foot width and the

access roads were a 50 foot wide corridor. A total of 305 acres was surveyed including approximately 11 acres of BLM Desert District lands, 143 acres on the Quechan Indian Reservation, and 152 acres of private land.

**III. Resources Located, Identified, and Evaluated (Significance Criteria Considered):**

This project recorded 24 new sites, seven isolated finds and field checked two previously recorded sites. Three sites are located in Arizona and 23 sites are in California. Site types and features include prehistoric trails, geoglyphs, cleared circles, petroglyphs, shrines, lithic scatters and ceramic scatters.

Of the 26 sites within the rights-of-way, two are on BLM El Centro Resource Area lands, 20 Quechan Indian Reservation, three on private and one is the Gila-Knob Transmission Line which is owned by Western. Three sites are located in Arizona and 23 sites are in California. The following is a list of site numbers by jurisdiction and recommended eligibility:

| | | |
|---|---|---|
| 4-IMP-7137 | BLM, El Centro | Not Eligible |
| 4-IMP-7146 | BLM, El Centro | Eligible |
| 4-IMP-7147 | Quechan | Eligible |
| 4 IMP-7148 | Quechan | Eligible |
| 4-IMP-7149 | Quechan | Not Eligible |
| 4-IMP-7140 | Quechan | Eligible |
| 4-IMP-7139 | Quechan | Eligible |
| 4-IMP-7138 | Quechan | Eligible |
| 4-IMP-7142 | Quechan | Eligible |
| 4-IMP-7141 | Quechan | Eligible |
| 4-IMP-7143 | Quechan | Eligible |
| 4-IMP-7144 | Quechan | Not Eligible |
| 4-IMP-689 | Quechan | Eligible |
| 4-IMP-7157 | Quechan | Not Eligible |
| 4-IMP-7156 | Quechan | Not Eligible |
| 4-IMP-7155 | Quechan | Not Eligible |
| 4-IMP-7154 | Quechan | Not Eligible |
| 4-IMP-7150 | Quechan | Not Eligible |
| 4-IMP-7153 | Quechan | Not Eligible |
| 4-IMP-7152 | Quechan | Not Eligible |
| 4-IMP-7151 | Quechan | Not Eligible |
| 4-IMP-7145 | Quechan | Not Eligible |
| AZ X:7:11 | Private | Not Eligible |
| AZ X:7:41 | Private | Not Eligible |
| AZ X:7:40 | Private | Not Eligible |
| 4-IMP-7158 | Variable | Not Eligible |

The sites that are listed as eligible appear to possess the quality of integrity and/or meet at least one of the criteria [(d) of 36 CFR § 60.4] necessary to be considered for inclusion within the National Register of Historic Places. Sites listed as not eligible have little or no integrity or recordation has exhausted their research potential. No resources that appear to qualify for consideration for protection under the American Indian Religious Freedom Act (16 USC 1996) were recorded during the inventory or were already known to be present.

IV. **Effects Determination and Compliance Decision:**

Effects determinations are the responsibility of the lead agency. Western has considered the nature of the undertaking and the presence of historic properties that may possess the qualities of integrity and meet at least one of the criteria necessary to be considered for inclusion in the National Register of Historic Places. Western believes that the level of field inventory was adequate to identify any historic properties.

Western has determined that the subject undertaking will have no effect on historic properties. All impacts will be restricted to previously disturbed areas and all eligible sites will be avoided. Western considers that the stipulations of Section 106 of the National Historic Preservation Act, as amended, and the implementing regulations, 36 CFR 800, have been satisfied.

V. **Special Conditions of Compliance**:

Western will ensure that all construction and maintenance activities avoid eligible properties. Western construction personnel will be briefed on avoidance areas. Should additional impacts become necessary for maintenance of the line, Western will consult with your office on appropriate data recovery methods.

If new discoveries are made during the course of this project, work in the immediate vicinity of the discovery will cease until Western can evaluate the discovery and consult, if necessary, with your office.

If you have any questions about this determination, please contact Ms. Judy Wilson at (602) 352-2434 or Ms. Mary Barger at (303) 275-1714.

Sincerely,

SIGNED

ACTING FOR Richard M. Duarte
Environmental Manager

Enclosures

bcc:
M. Barger, A7200, Golden, CO
R. Burnkrant, A7200, Golden, CO

G0460 (Wilson)

FILE: Gila Knob Cultural

JWilson:lb:05/24/95:D
05/30/95:F
WRF#0720:ENVIRON\LETTER\0720.D

Mr. Fritz Brown
President
Quechan Indian Reservation
Box 11352
Yuma, AZ 85364

Dear Mr. Brown:

Western Area Power Administration (Western) has considered the effects of the Gila-Knob 161-kV Wood-Pole Transmission Line replacement project on cultural resources. Per 36 CFR 800.5, Western has determined that the undertaking will have no effect on historic properties. The submission of this documentation fulfills Western's responsibilities under Section 106 of the National Historic Preservation Act.

**I. Description of the Undertaking:**

The proposed undertaking is the replacement of identified poles on the Gila-Knob 161-kV Wood-Pole Structure Transmission Line. This line is over 50 years old. The transmission line is 20.2 miles long and is located in Yuma County, Arizona, and Imperial County, California (see enclosed report).

A wood-pole testing program conducted for the transmission line determined that a number of the wood-pole transmission line structures have deteriorated and no longer have structural integrity (strength) or they are not fit to climb due to shell rot and surface cracking. The transmission line structures cannot be maintained if the wood-poles cannot be climbed. Therefore, Western plans to replace the deteriorated wood-poles.

The process of removing and replacing wood-pole transmission line structures usually results in no disturbances other than the areas originally disturbed when the line was constructed. In most cases, the wood-poles can be directly pulled from the ground, and the new pole put back into the same hole.

Access for this project will be restricted to existing access roads. Rubber-tired vehicles will be used for all work. All access roads were also surveyed should the road need upgrading through blading, leveling or filling.

**II. Methodology and Reporting:**

A search of the existing records for the area was conducted at the Arizona State Museum, affected Bureau of Land Management (BLM) offices and the Eastern Information Center, University of California, Riverside. The file searches indicated that there were 49 previously recorded sites within one mile of the transmission line and two were located within the right-of-way.

A 100 percent cultural resources inventory was conducted of the right-of-way and all access roads. The right-of-way consisted of a 125 foot width and the

access roads were a 50 foot wide corridor. A total of 305 acres was surveyed including approximately 11 acres of BLM Desert District lands, 143 acres on the Quechan Indian Reservation, and 152 acres of private land.

**III. Resources Located, Identified, and Evaluated (Significance Criteria Considered):**

This project recorded 24 new sites, seven isolated finds and field checked two previously recorded sites. Site types and features include prehistoric trails, geoglyphs, cleared circles, petroglyphs, shrines, lithic scatters and ceramic scatters.

Of the 26 sites within the rights-of-way, two are on BLM El Centro Resource Area lands, 20 Quechan Indian Reservation, three on private and one is the Gila-Knob Transmission Line which is owned by Western. The following is a list of site numbers by jurisdiction and recommended eligibility:

| | | |
|---|---|---|
| 4-IMP-7137 | BLM; El Centro | Not Eligible |
| 4-IMP-7146 | BLM, El Centro | Eligible |
| 4-IMP-7147 | Quechan | Eligible |
| 4_IMP-7148 | Quechan | Eligible |
| 4-IMP-7149 | Quechan | Not Eligible |
| 4-IMP-7140 | Quechan | Eligible |
| 4-IMP-7139 | Quechan | Eligible |
| 4-IMP-7138 | Quechan | Eligible |
| 4-IMP-7142 | Quechan | Eligible |
| 4-IMP-7141 | Quechan | Eligible |
| 4-IMP-7143 | Quechan | Eligible |
| 4-IMP-7144 | Quechan | Not Eligible |
| 4-IMP-689 | Quechan | Eligible |
| 4-IMP-7157 | Quechan | Not Eligible |
| 4-IMP-7156 | Quechan | Not Eligible |
| 4-IMP-7155 | Quechan | Not Eligible |
| 4-IMP-7154 | Quechan | Not Eligible |
| 4-IMP-7150 | Quechan | Not Eligible |
| 4-IMP-7153 | Quechan | Not Eligible |
| 4-IMP-7152 | Quechan | Not Eligible |
| 4-IMP-7151 | Quechan | Not Eligible |
| 4-IMP-7145 | Quechan | Not Eligible |
| AZ X:7:11 | Private | Not Eligible |
| AZ X:7:41 | Private | Not Eligible |
| AZ X:7:40 | Private | Not Eligible |
| 4-IMP-7158 | Variable | Not Eligible |

These sites appear to possess the quality of integrity and/or meet at least one of the criteria [(d) of 36 CFR § 60.4] necessary to be considered for inclusion within the National Register of Historic Places. No resources that appear to qualify for consideration for protection under the American Indian Religious Freedom Act (16 USC 1996) were recorded during the inventory or were already known to be present.

**IV. Effects Determination and Compliance Decision:**

Effects determinations are the responsibility of the lead agency. Western has

properties that may possess the qualities of integrity and meet at least one of the criteria necessary to be considered for inclusion in the National Register of Historic Places. Western believes that the level of field inventory was adequate to identify any historic properties.

Western has determined that the subject undertaking will have no effect on historic properties. All impacts will be restricted to previously disturbed areas and all eligible sites will be avoided. Western considers that the stipulations of Section 106 of the National Historic Preservation Act, as amended, and the implementing regulations, 36 CFR 800, have been satisfied.

V. Special Conditions of Compliance:

Western will ensure that all construction and maintenance activities avoid eligible properties. Western construction personnel will be briefed on avoidance areas. Should additional impacts become necessary for maintenance of the line, Western will consult with your office on appropriate data recovery methods.

If new discoveries are made during the course of this project, work in the immediate vicinity of the discovery will cease until Western can evaluate the discovery and consult, if necessary, with your office.

Please provide comments on our determinations of eligibility and effect. If you have any questions about these determinations, contact Ms. Judy Wilson at (602) 352-2434 or Ms. Mary Barger at (303) 275-1714.

Sincerely,

ACTING FOR Richard M. Duarte
Environmental Manager

Enclosures

bcc:
M. Barger, A7200, Golden, CO
R. Burnkrant, A7200, Golden, CO

G0460 (Wilson)

FILE: Gila Knob Cultural

JWilson:lb:05/24/95:D
05/30/95:F
WRF#0720:ENVIRON\LETTER\0720.C

STATE OF CALIFORNIA - THE RESOURCES AGENCY PETE WILSON, Governor

OFFICE OF HISTORIC PRESERVATION
DEPARTMENT OF PARKS AND RECREATION
P.O. BOX 942896
SACRAMENTO 94296-0001
(916) 653-6624
FAX: (916) 653-9824

June 26, 1995

Reply to: WAPA950605A

Richard M. Duarte, Environmental Manager
Western Area Power Administration
Phoenix Area Office
P.O. Box 6457
PHOENIX AZ 85005

Subject: Gila-Knob 161-kV Wood-Pole Transmission Line Replacement, Imperial County

Dear Mr. Duarte:

In accordance with 36 CFR 800, implementing regulations for Section 106 of the National Historic Preservation Act (NHPA), Western Area Power Administration (WAPA) has requested my comments on the subject undertaking. Thank you for consulting me.

My comments for this undertaking appertain only to the 23 properties identified within California. The three properties identified in Arizona are not within the ambit of my responsibility. It is evident that WAPA's inventory of the undertaking's Area of Potential Effects (APE) meets the Secretary of the Interior's Standards for Identification and I am satisfied that the requirements of 36 CFR 800.4(a and b) were fulfilled.

Thirteen sites identified within the APE were found not eligible for the National Register of Historic Places due to loss of integrity or the properties values were recovered during recordation. Ineligible sites include:

| | |
|---|---|
| CA-IMP-7137 | CA-IMP-7149 |
| CA-IMP-7144 | CA-IMP-7157 |
| CA-IMP-7156 | CA-IMP-7155 |
| CA-IMP-7154 | CA-IMP-7150 |
| CA-IMP-7153 | CA-IMP-7152 |
| CA-IMP-7151 | CA-IMP-7145 |
| CA-IMP-7158H | |

Properties that were found eligible include:

| Site: | NR Criteria | Site | NR Criteria |
|---|---|---|---|
| CA-IMP-7146 | D | CA-IMP-7139 | A,C,D |
| CA-IMP-7147 | D | CA-IMP-7138 | D |
| CA-IMP-7148 | A,D | CA-IMP-7142 | A,D |
| CA-IMP-7141 | A,D | CA-IMP-7140 | D |
| CA-IMP-7143 | D | CA-IMP-689 | D |

I do not object to any of WAPA's National Register evaluations.

WAPA has stated that effects will be restricted to previously disturbed areas, and that all eligible sites will be avoided during implementation of the undertaking. Consequently, WAPA has determined that the undertaking will have no affect on historic properties. I do not object with WAPA's effect determination.

Accordingly, WAPA has satisfied the responsibilities pursuant to 36 CFR 800. Be advised, however, that WAPA may have additional responsibilities pursuant to 36 CFR 800 under the following circumstances: (1) If any person requests that the Advisory Council on Historic Preservation (ACHP) to review WAPA's findings in accordance with 36 CFR 800.6(e); (2) if the undertaking changes in ways that could affect historic properties (36 CFR 800.5(c)); (3) if historic properties are discovered during the implementation of the undertaking or if a known historic property will be affected in an unanticipated manner (36 CFR 800.11); (4) if a property that was to be avoided has been inadvertently or otherwise affected in an unanticipated manner (36 CFR 800.4(c) and 800.5); or (5) if any condition of the undertaking, such as a delay in implementation or implementation in phases over time, may justify reconsideration of the current National Register status of properties within the undertaking's APE (36 CFR 800.4(c)).

Thank you for considering historic properties during project planning. If you have questions or comments, please contact staff archaeologist Mr. Steven Grantham at (916) 653-8920.

Sincerely,

Ms. Cherilyn E. Widell
State Historic Preservation Officer

Department of Energy
Western Area Power Administration
Desert Southwest Customer Service Region
P.O. Box 6457
Phoenix, AZ 85005-6457

Mr. Fritz Brown
President
Quechan Indian Reservation
Box 11352
Yuma, AZ 85362

Dear Mr Brown:

The Western Area Power Administration (Western) had previously consulted with your office on May 31, 1995, on the effects of the Gila-Knob 161-kV Wood Pole Transmission Line Replacement Project on cultural resources. It was determined that the undertaking will have no effect on historic properties.

In this previous correspondence, Western had agreed to use only rubber-tired vehicles for all maintenance activities. Due to the sandy soil composition of the lands located in the right-of-ways of this transmission line, Western needs to use a tracked vehicle for pulling line trucks and other maintenance equipment along the currently disturbed access roads. Western will use the existing access road to bring in tracked vehicle (with the blade up), and where necessary, pull other maintenance equipment through very sandy areas. Western has determined that there will be no effect on historic properties from using tracked vehicles. Western's former recommendation of only rubber-tired vehicles would severely hamper our ability to replace the structures along this transmission line.

Western is consulting with, Office of Historic Preservation, Department of Parks and Recreation, P.O. Box 942896, Sacramento, CA 94296-0001; State Historic Preservation Office, Arizona State Parks, 1300 West Washington, Phoenix, AZ 85007; and Bureau of Land Management, California Desert District, 6221 Box Springs Boulevard, Riverside, CA 92507-0909, on this recommendation. If you have any questions about this determination, please telephone Ms. Alison Jarrett at (602) 352-2434 or Ms. Mary Barger at (303) 275-1714.

Sincerely,

J. Tyler Carlson
Regional Manager

bcc:
M. Barger, A3400, Golden, CO

G0400 (Holt)
G5610 (Depoe)

FILE: 5440.04 Gila-Knob Transmission Line

AJarrett:lag:07/29/98:D
07/30/98:F
WRF#0630:ENVIRON\LETTER\0630.AJ

Department of Energy
Western Area Power Administration
Desert Southwest Customer Service Region
P.O. Box 6457
Phoenix, AZ 85005-6457

August 5, 1998

Ms. Cherilyn Widell
Office of Historic Preservation
Department of Parks and Recreation
P.O. Box 942896
Sacramento, CA 94296-0001

Dear Ms. Widell:

Western Area Power Administration (Western) had previously consulted with your office on May 31, 1995, on the effects of the Gila-Knob 161-kV Wood Pole Transmission Line Replacement Project on cultural resources. It was determined that the undertaking will have no effect on historic properties. In response, your office replied on June 26, 1995, with concurrence to our determination and recommendations for work requirements.

In this previous correspondence, Western had agreed to use only rubber-tired vehicles for all maintenance activities. Due to the sandy soil composition of the lands located in the rights-of-way of this transmission line, Western needs to use a tracked vehicle for pulling line trucks and other maintenance equipment along the currently disturbed access roads. Western will use the existing access road to bring in tracked vehicles (with the blade up), and where necessary, pull other maintenance equipment through very sandy areas. Western has determined that there will be no effect on historic properties from using tracked vehicles. Western's former recommendation of only rubber-tired vehicles would severely hamper our ability to replace the structures along this transmission line.

Western is consulting with State Historic Preservation Office, Arizona State Parks, 1300 West Washington, Phoenix, AZ 85007; Bureau of Land Management, California Desert District, 6221 Box Springs Boulevard, Riverside, CA 92507-0909; and Mr. Fritz Brown, President, Quechan Indian Reservation, Box 11352, Yuma, AZ 85364, on this recommendation. If you concur with Western's revised access of tracked vehicles along currently disturbed access roads please sign below.

If you have any questions, please telephone Ms. Alison Jarrett at (602) 352-2434, or Ms. Mary Barger at (303) 275-1714.

Sincerely,

for J. Tyler Carlson
Regional Manager

Concurrence
California State Historic Preservation Officer

If you have any questions, please telephone Ms. Alison Jarrett at (602) 352-2434, or Ms. Mary Barger at (303) 275-1714.

Sincerely,

J. Tyler Carlson
Regional Manager

Concurrence
California State Historic Preservation Officer

bcc:
M. Barger, A3400, Golden, CO

G0400 (Holt)
G5610 (Depoe)

FILE: 5440.04
Gila-Knob Transmission Line

AJarrett:djh:07/26/98:D
07/30/98:F
WRF#0602:ENVIRON\LETTER\0602.AJ

60440 (Jarrett)

SEP -3 1998

Mr. Mike Jackson, Sr.
Tribal President
Fort Yuma-Quechan Tribe
P.O. Box 1899
Yuma, AZ 85366-1899

Dear Mr. Jackson:

The Western Area Power Administration, U.S. Department of Energy (Western), owns, operates, and maintains the Gila-Knob 161-kV Transmission Line on an easement across The Fort Yuma-Quechan Tribe's lands in Imperial County, California. The location of the transmission line is shown on the enclosed map.

Western plans to replace most of the old wood pole structures on this line (approximately 20 miles) with lightweight steel structures. Structure replacement will start the 1st of October and continue for several months. This work will require construction of landing sites around some structures and will involve several pieces of heavy equipment to complete the task.

Western as the lead federal agency for the National Environmental Policy Act, Endangered Species Act and the National Historic Preservation Act, has reviewed the project. Through our consultations with the U.S. Fish and Wildlife, and the Arizona and California State Historic Preservation Offices, Western has determined our actions will not affect biological and cultural resources. We would like to extend this opportunity for you to contact Mr. John Holt at (602) 352-2592 or Ms. Alison Jarrett at (602) 352-2434, if you have any questions or concerns regarding these issues.

Western would appreciate your help in coordinating the structure replacement project. If you have any questions or have information concerning crops, irrigation, or harvest schedules that could require special timing of the work on your property, please contact Mr. Mark DePoe at (602) 352-2687 or at (800) 682-6557. A request for information form with a return envelope is enclosed if you wish to respond by mail.

Western will make every effort to coordinate the structure replacement project to limit interference with any farming operations or damage to crops/property.

Sincerely,

ROY E. WATSON

Roy E. Watson
Realty Officer

Enclosures

cc on following page

15 Sept 1998

Mr. Daniel Abeyta, Acting SHPO
ATT: Steve Grantham
Office of Historic Preservation
Department of Parks and Recreation
Box 942896
Sacramento
CA 94296-0001

Dear Mr. Abeyta:

Western Area Power Administration (Western) received your letter requesting additional information regarding the use of a tracked vehicle on the Gila-Knob 161-kV Transmission Line access roads. Western needs to use a tracked vehicle during a wood pole replacement project in order to pull rubber-tired vehicles (e.g. pole truck) through washes and up steep grades. Western believes walking a tracked vehicle across these sites will have no effect on historic properties.

**Eligible Properties**
A cultural resource inventory was conducted of the access roads ("Intensive Cultural Resource Inventory for the Western Area Power Administration Gila-Knob 161-kV Transmission Line, Imperial County, California and Yuma County, Arizona" by Moreno et al. 1995). This report was submitted to your office on May 31, 1995. Your office concurred with Western's recommendations of eligibility and effect.

There are 10 eligible sites in California along this transmission line which the tracked vehicle will need to traverse. They include: 4-IMP-7146, 4-IMP-7147, 4-IMP-7148, 4-IMP-7140, 4-IMP-7139, 4-IMP-7138, 4-IMP-7142-, 4-IMP-7141, 4-IMP-7143 and 4-IMP-689. Copies of the site maps are enclosed for clarification.

Site 4-IMP-7146 is a lithic scatter with three discrete reduction localities and cleared circles. The site is on a terrace made up of desert pavement. The existing access road bisects the site. This road is two vehicles in width and is bladed into the desert pavement. There are no features near the road, no apparent depth to the site and no artifacts in the road.

Site 4-IMP-7147 is a lithic scatter with one flaking station, one cleared circle and three potential cleared circle. The site is on a terrace made up of desert pavement. The existing access road bisects the site. This road is two vehicles in width and is bladed into the desert pavement. There are no features near the road, no apparent depth to the site and no artifacts in the road.

Site 4-IMP-7148 is a lithic scatter with a trail segment, three geoglyphs, three cleared circles, a cleared rectangle and at least 25 piles of cobbles. The site is located on a desert pavement terrace. The main access road, which is two vehicles in width and is bladed into the desert pavement, follows the northern edge of the site bearing east-west. A two-track road bisects the site from north-south, but is not a Western road. One feature, the cleared rectangle, is located just north of the existing main access road. The site has no apparent depth and there are no artifacts in the road.

Site 4-IMP-7140 is a sparse lithic scatter with two cleared circles. The site is located on a desert pavement ridge. The access road follows the ridge through the site to a wood pole structure, 18/8. The road is a single vehicle in width and is bladed into the desert pavement. The site has no apparent depth, there are no artifacts in the road and the features are away from the road.

Site 4-IMP-7139 is a sparse lithic scatter, two intaglios, a trail segment, and 42 cobble clusters. The site is located on a terrace mantled with desert pavement. The main access road bisects the site from north-southeast. Another road circles the intaglios to the east (this road is not used by Western). A road which is a single vehicle in width crosses the site to the east to access a wood pole structure. All roads are bladed into the desert pavement. The intaglios are about 2 meters from the edge of the existing road and one cobble cluster is next to the road. There is no apparent depth to the site and no artifacts in the road.

Site 4-IMP-7138 is a sparse lithic scatter with two cleared circles and four flaking stations. The site is located on a small hill of desert pavement. The existing road enters the site and ends in the middle of the site a wood pole structure 18/7. This road is a single vehicle in width and is bladed into the desert pavement. There are no artifacts in the road, no features near the road and the site has no apparent depth.

Site 4-IMP-7142 is a sparse lithic scatter with four flaking stations, two cleared circles, one trail segment and three cobble clusters. The site is on a low terrace of desert pavement. The existing access road, which is two vehicles in width and is bladed into the desert pavement, bisects the site. There are no artifacts in the road, no features near the road and no apparent depth to the site.

Site 4-IMP-7141 is a moderately dense lithic scatter with 14 flaking stations, five cleared circles, one rock ring and 14 cobble clusters. The site is located on a river terrace of desert pavement. The existing road bisects the site and includes wood pole structure 18/6. This road is two vehicles in width and is bladed into the desert pavement. One flaking station and one cobble feature are located near the wood pole structure near the road. The site has no apparent depth and there are no artifacts in the road.

Site 4-IMP-7143 is a sparse lithic scatter with seven flaking stations, and four cleared circles. The site is on a desert pavement terrace. The existing road bisects the site and includes wood pole structure 18/5. The road is two vehicles in width and is bladed into the desert pavement. A small piece of this road forks off to wood pole structure 18/5. This piece is one vehicle in width and is bladed into the desert pavement. Three flaking stations are located near the road. There are no artifacts in the road and there is no apparent depth to the site.

Site 4-IMP-689 is a low density lithic scatter with one flaking station located on a series of heavily eroded dunes. There was no evidence of features eroding out. All artifacts were tallied and they included 264 lithics, 41 of which are the flaking station. The site measures 450 X 130M. The site was originally recorded as a cleared circle with no artifacts. No cleared circle was identified. The access road bisects the site and includes three wood pole structures, 18/3 and 18/2 and 18/1 within the site boundary. The road is two vehicles in width and is bladed down to hard pan. One segment of the road to wood pole structure 18/2 is one vehicle in width. There

are no artifacts in the road and no features near the road.

**Recommendations**

For all the above-mentioned sites, the tracked vehicle will only walk through the sites on the existing access road, with the blade up. The tracked vehicle will not be pulling any vehicles through the above-mentioned site boundaries. The vehicle will stay within the road prism. The two-vehicle-in-width roads are public access roads and are maintained by some public entity. Roads leading to and ending at wood pole structures are only maintained by Western. Due to the nature of the topography and soils, these roads have not required any maintenance in years. None of these sites have artifacts or features located within the road prism. The tracked vehicle will only be used when the roads are dry.

The concerned sites are located on Bureau of Land Management (BLM) and Quechan Indian Tribe lands. Western has consulted with the Quechan Indian Tribe and the BLM on this recommendation. They have expressed no concerns with having the tracked vehicle walk across these sites on the existing access roads.

Please comment on our determination of no effect. We would appreciate a quick review on this since our maintenance crews are prepared to start this project. If you have any questions, please call me at (303)275-1714 or Alison Jarrett at (602) 352-2434. Thank you for your assistance in this project.

Enclosures

STATE OF CALIFORNIA — THE RESOURCES AGENCY

PETE WILSON, Governor

**OFFICE OF HISTORIC PRESERVATION**

**DEPARTMENT OF PARKS AND RECREATION**

P.O. BOX 942896
SACRAMENTO 94296-0001
(916) 653-6624
FAX: (916) 653-9824

September 23, 1998

Reply to: WAPA 980916A

Mary Barger, Historic Preservation Officer
Western Area Power Administration
P.O. Box 3402
GOLDEN CO 80401

Subject: Gila-Knob 161-kV Transmission Line Access Road, Imperial County

Dear Ms. Barger:

Thank you for the additional information regarding the changes in the subject undertaking.

The Western Area Power Administration (WAPA) is proposing to carry out activities within the boundaries of historic properties mentioned in its letter dated September 15, 1998. The WAPA has determined that these activities will not affect the historic properties. Because the WAPA indicated that the activities will be conducted in well traveled, hard packed two-lane roads, which it alleges do not posses the values that render the properties historic, I do not object with its determination.

Thank you for informing me of the change to the original undertaking. I appreciate that the WAPA re-opened consultation and considered the effects of the undertaking on historic properties. If you have questions, please do not hesitate to call Hans Kreutzberg at (916) 653-9107.

Sincerely,

Daniel Abeyta
Deputy State Historic Preservation Officer

Department of Energy
Western Area Power Administration
Desert Southwest Customer Service Region
P.O. Box 6457
Phoenix, AZ 85005-6457

MAR 19 1999

Ms. Pauline Owl
Chairperson, Cultural Committee
Quechan Tribe
P.O. Box 282
Winterhaven, CA 92283

Dear Ms. Owl:

This letter is in response to a conversation you had with Western Area Power Administration's (Western) Archaeologist, Ms. Mary Barger on March 2, 1999, about an archaeological site that had been damaged on tribal lands. The site is 4IMP7140, a small lithic scatter with two sleeping circles that was recorded in 1994 by WCRM during a right-of-way survey for Western. The site is within Western's right-of-way for the Gila-Knob Transmission Line, and a wood pole transmission line structure (#18-8) is located in the site boundary. The site is located just north of Interstate 10, near Sidewinder Road.

The site was damaged when Western's maintenance crew went in to replace the existing wood pole H-frame transmission structures with steel structures. As agreed to with your office, Western had recommended the site as eligible for inclusion in the National Register and agreed to avoid the site. Western went to the field with the maintenance staff to identify and flag off areas for avoidance prior to this maintenance project. However, the sleeping circles and lithic scatter were damaged by the pole replacement project.

Upon your recommendation, Western staff visited this site and several others targeted for avoidance with your consultant, Lorey Cachora, on March 8, 1999. Western's staff included myself, Ms. Alison Jarrett, Environmental Specialist, and Ms. Mary Barger, Archaeologist. Mr. Cachora said he would come back to discuss the findings of this field visit with the Cultural Committee. He also suggested Western give a face-to-face presentation to the Cultural Committee on what happened, how it happened, and what Western will do differently in the future.

Currently, Western is initiating a Class C investigation of this incident. A team will be starting their investigation the week of March 15, 1999. Western hopes to have a report completed by April 12, 1999. Western would like to share with you the results of the report when it is finalized. Western will also send a copy to the California State Historic Preservation Office, as they requested. The Class C investigation will identify how this incident happened and measures for prevention for future incidents.

Please provide us some dates and times to come to your office and have a meeting about this incident. You can reach me at (602) 352-2592, Ms. Alison Jarrett at (602) 352-2434 or Ms. Mary Barger at (303) 275-1714. We appreciate your advice and concern on this project.

Sincerely,

John Holt

John Holt
Environmental Manager

cc:

Mr. Chuck Wahtford
Office of Historic Preservation
P.O. Box 942896
Sacramento, CA 94296-0001

Mr. Lorey Cachora
Quechan Cultural Consultant
P.O. Box 894
Winterhaven, CA 92283


Pole Structure
Number 18-8
Yuma
YUMA INTERNATIONAL AIRPORT
South Gila Valley
RIVER
North Gila Valley
ARIZONA

Archaeological Investigations of Impactions on Quechan Tribal Reservation

A Report for the Quechan Cultural Committee by Jay von Werlhof, Archaeologist

Lorey Cachora, Quechan tribal archaeologist and member of the Quechan Cultural Committee, requested that I investigate three sacred sites on the Quechan Tribal Reservation that had been severely impacted during construction of a transmission line. The sites had been recorded in August, 1994, when Western Area Power Administration proposed crossing the reservation with its Gila-Knob 161-KV power lines to the Pilot Knob Substation immediately east of Sidewinder Road in southeastern Imperial County, ten miles west of Winterhaven.

The sites are portions of a group of seventeen that Western Cultural Resources Management company recorded along that stretch of the proposed corridor crossing the reservation. The impacted sites are near the 300' contour, and closely spaced along a narrow curving ridge that erosive channels had isolated. The surface of the disfigured mesa is formed of water-worn quartzite, chert and rhyolite cobbles and pebbles that the Colorado River laid down 100,000 years ago. Thick and dark desert varnish coats the dorsal side of the ancient stones while a deep reddish-orange patina colors the ventral. The Quechan had formed ceremonial bases for the three sites within this context, and probably within the same general time period. They possess similar characeristics, are close together, and are on the same contour. While some stone flaking activity within the sites are also ceremonially related, numerous randomly scattered areas of overturned cobbles and pebbles along the ridge tell of activities associated specifically with tool production, itself, and appearing to be of a different time period, both earlier and later.

The photographs shown below document the impaction which was unnecessary to the construction project. Indeed, WAPA personnel stated to Lorey Cachora that the crews had been told of the sensitive sites which were staked with cautionary flagging. Despite that, the supervisor at the site ordered the sacred features impacted rather than using other available space for maneuvering heavy duty equipment. **This was a tactical decision in violation of law and a decent respect for the Quechan, their property, and sacred features vital to their heritage. It would be unconscionable to allow this flagrant act to remain unchallenged and the supervisor unpunished. Restoration of the sites is not a forgiveable option since the spiritual essence of each has been destroyed.**

On 6 April 1999, Lorey Cachora directed me to the most westerly site, 4-IMP-7147. Lorey's briefing about the impaction had at first discouraged, depressed, then angered me. But, it still did not ready me for the shock of seeing the effects of a ten ton dozer driven through the center of what once was, itself, a site of ceremonial power. For detailed descriptions and cultural inventory of this site, consult the WCRM record, 16 August 1994, copies of which are at Southeastern California Information Center at Imperial Valley College Desert Museum , and at Quechan Tribal Headquarters, Cultural Committee Office. I took the following photographs of this site, shown below. Photograph Lot #17229, Frames 17-19 are of impactions on ceremonial circles from construction. Frame 21 of a vision quest site at the extreme southwestern nose of the ridge. Frame 24 shows a quartzite teshoa scraper Lorey Cachora is holding. Frame 0 is from Photograph

of a linear geoglyph, looking to NNE; Frame 1 is of the geoglyph looking to SSW. This earthen art figure is south of the ceremonial circles, and east of the vision quest.

Site 4-IMP-7148 is two hundred meters east of 7147, and composed of three geoglyphs, three cleared circles, and approximately twenty-five mounds of heavily varnished quartzite cobbles. This site, like the previous one, contains ceremonial or spiritual features as well as a few functional lithic tools. The geoglyphs are essentially 2 to 2.3 meter diameter cleared rings with a mound of mosaic cobbles at the hub (see Frames 12-13). The three geoglyphs are arranged to form a triangle, with the apex oriented north. It is likely that the whole geoglyph design is an iconic projection of the three spirit mountains sacred to Yuman tribes. In the north, to which the icon points, is Spirit Mountain, to the southeast is Muggins Peak, and to the southwest is Pilot Knob. Twenty other mounds, mosaics, or cluster- of cobbles (see examples in Frames 6,8) are randomly placed throughout the site, though seven of them are arranged in a similar pattern to the geoglyph in 4-IMP-7147. The damage inflicted on this site is severe, mainly with vehicular tracks of heavy equipment miring into the desert pavement (see Frames 3,5,7,11,15). Frames 3,5,7,15,18 show that construction vehicles maneuvered a considerable distqnce outside the specified construction corridor. In several instances single tracks (Frames 3,5) show that vehicles were not using regular turn-around spaces within the designated corridor. It is likely that mounds shown in Frames 6,8,10) were assembly stations for future use in constructing features.

4-IMP-7149 is 220 meters east of the previous site, 4-IMP-7148. It is the third site on this single stretch of desert pavement, and is at the east end of the mesa remnant that here bends around to form a southerly leg. It is the only site that also contains two pristine features, both cleared circles (Frame 20b) in wholly undisturbed pavement. This gives a fuller understanding of the condition of the sites on this mesa before historic wanton destruction targeted them. The site is similar to the other two, containing spiritual as well as temporal features. A quartz reduction power station was noted at this site.

The antiquity of these sites is indicated with the build-up of desert varnish on flake scars of some cores, indicating a prior usage of the mesa before sacred features were formed. Cobble clusters (Frame 21b) ESE of the cleared circles (Frame 20b) tie this site to the others on the mesa. As with other clusters, there is an obvious pattern of foot tamping within the immediate area, indicating a ceremonial usage associated with the clusters.

In summary, this report supplies additional evidence on the

willful destruction of Quechan sacred features extending far into the tribal ancient past and heritage. It is impossible to restore these destroyed features. Restoration of the sites would merely restore their appearances, not their essence. For such crass behavior, punitive damages should be assessed the company, and criminal chaarges filed against the field supervisor for directing this destruction of Native American sacred sites. These responses would serve notice to others that such disregard for law and Quechan culture will not be tolerated.

This report is respectfully submitted to Quechan Cultural Committee.

Jay von Werlhof,
Archaeologist




Mapped, edited, and published by the Geological Survey in cooperation with the State of California

Control by USGS, USC&GS, USCE, and U. S. Bureau of Reclamation

Topography by photogrammetric methods from aerial photographs taken 1948 and planetable surveys 1952. Revised from aerial photographs taken 1961. Field checked 1964

Polyconic projection. 1927 North American datum 10,000-foot grid based on California coordinate system, zone 6

Araz Quadrangle
1964 N3245-W11437.5 AMS 3049 I SW-V895







CO
DOTTED

State of California – The Resources Agency
DEPARTMENT OF PARKS AND RECREATION

# ARCHEOLOGICAL SITE LOCATION MAP

Page 5 of 7.

Permanent Trinomial: 4-IMP-7147 4/95
Mo. Yr.

Other Designations:



State of California – The Resources Agency
DEPARTMENT OF PARKS AND RECREATION

# ARCHEOLOGICAL SITE LOCATION MAP

Permanent Trinomial: 4-IMP-7148

Other Designations: ______

Page 5 of 10



State of California – The Resources Agency
DEPARTMENT OF PARKS AND RECREATION

ARCHEOLOGICAL SITE LOCATION MAP

Page 5 of 5

Permanent Trinomial: ______

Other Designations: ______









19



20



21



24







3

5





6



7



8



15







12



13



20[illegible]



19



186

JS44

(Rev 07/89)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

02 JUN -7 PM 12:27

**I (a) PLAINTIFFS**

Quechan Indian Tribe, a federally recognized Indian Tribe, on its own behalf, and as parens patriae on behalf of its members

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** Imperial

**(EXCEPT IN U.S. PLAINTIFF CASES)**

**DEFENDANTS**

United States of America; Department of Energy; Spencer Abraham, Secretary of Energy; Western Area Power Administration; and Michael S. Hacskaylo, Administrator, Western Area Power Administration

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT**

**(IN U.S. PLAINTIFF CASES ONLY)**

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

DEPUTY

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

Morisset, Schlosser, Jozwiak & McGaw
801 Second Ave., Suite 1115
Seattle, WA 98104
206-386-5200

**ATTORNEYS (IF KNOWN)**

'02 CV 01096 IEG (AJB)

**II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)**

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX (For Diversity Cases Only) FOR PLAINTIFF AND ONE BOX FOR DEFENDANT**

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).**

See Attachment. 28: 1362 IC

**V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)**

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veterans Benefits
- ☐ 160 Stockholders Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Tort to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury-Medical Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☒ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence Habeas Corpus
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prisoner Conditions

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS - Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reappointment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities Exchange
- ☐ 875 Customer Challenge 12 USC
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State
- ☐ 890 Other Statutory Actions

**VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)**

☒ 1 Original Proceeding ☐ 2 Removal from State Court ☐ 3 Remanded from Appelate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p 23 DEMAND $ Check YES only if demanded in complaint: JURY DEMAND: ☐ YES ☒ NO

**VIII. RELATED CASE(S) IF ANY (See Instructions):** JUDGE Docket Number

DATE June 4, 2002 SIGNATURE OF ATTORNEY OF RECORD [signature]

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

ORIGINAL

Pd $150.00 6/7/02 #83246 KD

## IV. CAUSE OF ACTION.

Plaintiff Quechan Indian Tribe, in its own capacity and as *parens patriae* on behalf of its members, seeks declaratory and injunctive relief and damages relating to the destruction and damage of Archaeological Sites that occurred within the Tribe's Fort Yuma Reservation located in Imperial County, California under the following statutes: (a) 28 U.S.C. § 1346(b), this being an action against the United States for money damages for injury or loss of property caused by the negligent or wrongful act or omission of federal employees while acting within the scope of their office or employment; (b) 28 U.S.C. § 1367, this being an action that includes state law claims over which this court has supplemental jurisdiction; (c) 28 U.S.C. § 702, this being an action that seeks declaratory relief in addition to money damages, and claims that agency actions violate standards set forth in 5 U.S.C. § 706; (d) federal archaeological protection laws, including but not limited to the National Historic Preservation Act, 16 U.S.C. §§ 470a-470w-6; and, (e) 28 U.S.C. § 1361, this being an action seeking mandamus. Plaintiff bases its request for a declaration of rights on 28 U.S.C. § 2201 and § 2202, and for injunctive relief on the laws cited herein.

T:\WPDOCS\0267\09913\pleadings\CoverSheetAttachment.wpd
KFN:05/24/02