NICOLA T. HANNA
United States Attorney
DOROTHY A. SCHOUTEN
Assistant United States Attorney
Chief, Civil Division
ROBYN-MARIE LYON MONTELEONE
Assistant United States Attorney
Chief, General Civil Section
THOMAS K. BUCK (Cal. Bar No. 70307)
Assistant United States Attorney
DAVID GORLIN
Special Assistant United States Attorney and
Attorney for the Western Power Administration
     Federal Building, Suite 7516
     300 North Los Angeles Street
     Los Angeles, California 90012
     Telephone: (213) 894-3989 (Buck)
     Telephone (720) 962-7028 (Gorlin)
     Facsimile: (213) 894-7819
     E-mail: tom.buck@usdoj.gov
     Email:  gorlin@wapa.gov

Attorneys for Defendant
United States of America

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUECHAN INDIAN TRIBE,<br><br>          Plaintiffs,<br><br>          v.<br><br>UNITED STATES OF<br>AMERICA,<br><br>          Defendant[s]. | Case No 02cv1096-JAH(AJB)<br><br>**DEFENDANT'S POST-TRIAL REPLY**<br><br>HONORABLE JOHN A. HOUSTON<br>UNITED STATES DISTRICT JUDGE<br><br>Courtroom 13B |

# **TABLE OF CONTENTS**

DESCRIPTION                                                                                          PAGE

I.    INTRODUCTION ................................................................................................ 1

II.   PLAINTIFF MISCHARACTERIZES OR OMITS KEY FACTS
      RELEVANT TO A REASONABLE DAMAGES AWARD ................................. 1

      A.    Plaintiff Repeatedly Overstates the Injury Suffered and the
            Egregiousness of Defendant's Conduct ...................................................... 2

      B.    The Tribe Initiated its Casino Project Without Regard for Cultural
            Resources, and Subsequent Expenses Must be Viewed in that Context ....... 4

      C.    Applying the Perspective of Lorey Cachora, Plaintiff Destroyed
            Cultural Resources During Casino Development ......................................... 5

III.  PLAINTIFF ASKS THE COURT TO REJECT MARKET VALUATION
      BY MISAPPLYING LAW AND MISCHARACTERIZING FACTS ................. 6

      A.    The Land is Capable of Market Valuation .................................................. 6

            1.    The Property's Location does not bar Market Valuation ................. 6

            2.    Plaintiff's "Uniqueness" Claims are Unsupported and
                  Contradicted ................................................................................ 7

            3.    Plaintiff Mischaracterizes the Testimony of Bell, McAllister,
                  and Tomasi in Claiming that Market Value cannot be
                  Ascertained .................................................................................. 8

      B.    In Attempting to Discredit Bell's Analysis, Plaintiff Misapplies
            Environmental Caselaw and Distorts Bell's Methods and Results ............... 9

            1.    Plaintiff Misapplies Environmental Caselaw ................................. 9

            2.    Monetization is not a Condition for Tribal Recovery ...................... 10

            3.    Plaintiff Mischaracterizes Bell's Land Sale Analysis ..................... 11

IV.   IF THE COURT REJECTS MARKET VALUATIONS, MCALLISTER'S
      PROJECTED COST OF RESTORATION AND REPAIR ASSESSMENT
      UNDER ARPA IS A RELIABLE MEASURE OF PLAINTIFF'S
      DAMAGES ........................................................................................................ 12

      A.    Emergency Restoration and Repair Costs .................................................. 13

      B.    Costs of Preparing Expert Report .............................................................. 14

      C.    "Archaeological Value" ............................................................................ 15

V.    TOMASI IS THE ONLY CREDIBLE EXPERT ON NATURAL
      RESOURCE DAMAGE ECONOMICS, AND MEYER'S DAMAGE
      ASSESSMENT IS FUNDAMENTALLY UNRELIABLE ................................. 16

i

A.    Tomasi is Supremely Qualified to Critique Meyer's Assessment .............. 16

B.    Rather than Produce an Objective Economic Assessment, Meyer Relied on Notions of Quechan Cultural Reality, an Area in which he Lacked Expertise, and Let Plaintiff Dictate his Process and Results ........ 17

C.    For the First Time, Plaintiff Claims Meyer Devised a "Modified" REA; Regardless of Labels, Tomasi's Critiques Remain Valid and Meyer's Departures from REA Practice were Unacceptable .................... 20

D.    Meyer's Assessment is Fundamentally Defective ....................................... 23

VI.    CONCLUSION .................................................................................................. 25

1

**TABLE OF AUTHORITIES**

2

<u>DESCRIPTION</u>                                                                    <u>PAGE</u>

3

**Federal Cases**

4

<u>Cal. Dep't Pub. Works v. 25.09 Acres of Lands,</u>
5
  329 F. Supp. 230 (S.D. Cal. 1971) ............................................................. 7
6

<u>Coast Indian Community v. United States,</u>
  550 F.2d 639 (Ct. Cl. 1977) ...................................................................... 7
7

<u>Commonwealth of Puerto Rico v. SS Zoe Colocotroni,</u>
8
  628 F.2d 652 (1st Cir. 1980) ................................................................... 10
9

<u>Gerritsen v. Warner Bros. Entm't Inc.,</u>
  112 F. Supp. 3d 1011 (C.D. Cal. 2015) .................................................... 3
10

<u>Gila River Pima-Maricopa Indian Cmty. v. United States,</u>
11
  467 F.2d 1351 (Ct. Cl. 1972) .................................................................... 7
12

<u>Hansen Bev. Co. v. Innovation Ventures, LLC, No. 08-CV-1166-IEG,</u>
13
  2009 U.S. Dist. LEXIS 127605 (S.D. Cal. Dec. 22, 2009) ........................ 3
14

<u>United States v. Fisher,</u>
  977 F. Supp. 1193 (S.D. Fla. 1997) ......................................................... 10
15

<u>United States v. Great Lakes Dredge & Dock Co.,</u>
16
  259 F.3d 1300 (11th Cir. 2001) ............................................................... 10
17

<u>United States v. Hunter,</u>
  48 F. Supp. 2d 1283, 1292-93 (D. Utah 1998) ......................................... 15
18

<u>United States v. Union Pacific Railroad Company,</u>
19
  565 F. Supp. 2d 1136 (E.D. Cal. 2008) ...................................................... 9
20

<u>White Mountain Apache Tribe of Ariz. V. United States,</u>
  10 Cl. Ct. 115 (1986) ................................................................................7

**Federal Statutes**

21

16 U.S.C. § 470ff .............................................................................................. 13
22

16 U.S.C. § 1431 .............................................................................................. 10
23

28 U.S.C. § 1346(b)(1) ....................................................................................... 9
24

42 U.S.C. § 7152(a) ............................................................................................ 3
25

43 U.S.C. § 485 ................................................................................................... 3

**State Statutes**

26

Cal. Civ. Code § 3333 .................................................................................. 2, 13
27

Health and Safety Code § 13007 ...................................................................... 9

28

**Federal Rules of Evidence**

Rule 201 .................................................................................................................. 3

**Federal Regulations**

43 C.F.R. § 7.15 ................................................................................................... 13

43 C.F.R. §§ 11.14(v) .......................................................................................... 22

## I.   INTRODUCTION

Plaintiff has the burden of proving, with reasonable certainty, the damages sustained as a result of Defendant's wrongful conduct, and damages which are speculative or remote cannot serve as the legal basis of recovery. *See* Dkt. #395 at 15:14-21. Plaintiff has failed to meet its burden of proving its $9.4M damages demand,[1] particularly given that it depends entirely on the deeply flawed assessment of Philip Meyer, who had never conducted a monetary damage assessment or resource equivalency analysis ("REA") prior to his work on this case. Plaintiff now characterizes Meyer's method as a "modified" REA to justify his departures from quantitative analysis (which is definitional of REA) and his concession that his process and results were dictated by Quechan cultural reality, a subject distinct from resource economics. Notwithstanding Plaintiff's attempts to rebrand and defend Meyer's assessment, Dr. Tomasi's testimony is entitled to substantial weight, and Meyer's fundamentally defective assessment should be disregarded.

Plaintiff sues only for property damage, and Dr. Bell has determined the market value of the subject property, which consists of 10 cultural sites, to be $2,000/acre. Plaintiff's arguments that market value cannot be ascertained is contrary to fact and law, and Bell's assessment offers the Court a reasonable range of monetary damages. If the Court does not accept market valuation, Defendant offers an alternative, Mr. McAllister's ARPA-based projected cost of restoration and repair assessment. Based on the facts here, there is no basis for upward modification of an ARPA-based award.

## II.   PLAINTIFF MISCHARACTERIZES OR OMITS KEY FACTS RELEVANT TO A REASONABLE DAMAGES AWARD

While it is an unfortunate reality that cultural sites were disturbed, Plaintiff repeatedly overstates its injury, mischaracterizes Defendant's conduct, and ignores fundamental facts that are relevant to a *reasonable* damages award.

---

[1] Plaintiff continues to claim $9.4M in its Post-trial Brief, despite having dropped its $2M claim for emotional distress damages. *See* Dkt. #395 at 12 n.7, 73 n.61.

1

**A.    Plaintiff Repeatedly Overstates the Injury Suffered and the Egregiousness of Defendant's Conduct**

Plaintiff argues, without *any* support or citation, that "the United States came onto the Tribe's homeland and destroyed resources held sacred by the Tribe." Dkt. #396 at 37:18-19; *see also id.* at 32:13, 39:18, 43:8 (repeatedly claiming, without support, that the United States "destroyed" Plaintiff's cultural sites). Plaintiff's false, misleading, and inflammatory rhetoric should be rejected for multiple reasons.

First, the Court has *not* held the United States liable for "destruction" of the ten cultural sites at issue, but rather, for impacts, disturbances, and scarring within specified, limited portions of the ten sites. Dkt. #319; Dkt. #395 at 65:4-13. Plaintiff's charge of "destruction" overlooks McAllister's testimony that the sites are largely intact and available for religious and cultural use by tribal members, and even ignores Meyer's own data, which indicated that he was *unsure* about effects on cultural usability for 60% of the sites forming the basis of his assessment. Tr. at 599:23-600:7; Dkt. #395 at 48:4-49:3. Further, Plaintiff's repeated rhetoric that Western "destroyed" its cultural resources during the 1998-99 pole replacement project ignores significant pre-project impacts (some "intensive," "extensive," and "severe") including from non-Western causes such as off-road vehicles ("ORVs"). Dkt. #395 at 9 n.1, 50:5-51:1. Any reasonable award must compensate Plaintiff for the *incremental* detriment proximately caused by the project, not for other harms to the cultural sites. *See* Cal. Civ. Code § 3333. As with its expert's damage assessment, Plaintiff's damages demand is unreasonable, contradicted by Meyer's own data, and divorced from the Court's findings and factual record.

Second, despite the implication of Plaintiff's rhetoric, the United States was not a reckless invader that looted or vandalized tribal property. Western, as a power marketing administration of the U.S. Department of Energy ("DOE"), is statutorily obliged to operate and maintain its transmission system to deliver wholesale power to preference

2

power customers, including Native American tribes.[2] Western retained WCRM to conduct a cultural resource inventory of the Gila-Knob transmission line prior to making required upgrades and provided multiple notices to the Tribe of its project. Dkt. #319 ¶¶ 1, 6-10. Western did not attempt to conceal damage from the pole replacement project; rather, it informed the Tribe when it discovered a site had been damaged. *See id.* ¶¶ 20-21. Plaintiff's rhetoric also overlooks the adjudicated fact that the United States owns the 100-foot-wide transmission line right-of-way ("ROW") in fee simple. Dkt. #319 ¶ 3.[3]

Third, Plaintiff presents no evidence that the ten sites at issue held any particular significance to the Tribe prior to the filing of its lawsuit. *See* Dkt. #395 at 18:20-19:6. Of the ten sites at issue, nine had not even been identified until WCRM surveyed the right-of-way. *See* Ex. 1-40 (noting only Site 689 was previously identified). Plaintiff did not respond to any of the multiple Western notices of the pole replacement project (Dkt. #319 ¶ 11) and cites to no evidence of any significant, modern active use of the ten sites at issue.[4] Plaintiff did not call any witness at the damage phase trial who visited or used these sites prior to litigation or who was aware of these sites as distinct from the other "hundreds of thousands" of Quechan sites. *See* Dkt. #311 at 261:17-22. These factors do not necessarily foreclose monetary damages, but they must inform a reasonable award.

---

[2] *See* About WAPA, *available at* https://www.wapa.gov/About/Pages/about.aspx; *see also, e.g.*, Reclamation Project Act of 1939 (as amended), 43 U.S.C. §§ 485 *et seq.*; Act of May 28, 1954, 68 Stat. 143 (establishment of Parker-Davis project); Department of Energy Organization Act of 1977, 91 Stat. 565, 42 U.S.C. 7152(a) (transferring transmission functions to DOE). Under Rule 201 of the Federal Rules of Evidence, the Court "can take judicial notice of public records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies." *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) (internal quotations omitted) (citing *Hansen Bev. Co. v. Innovation Ventures, LLC*, No. 08-CV-1166-IEG, 2009 U.S. Dist. LEXIS 127605, at *6-7 (S.D. Cal. Dec. 22, 2009)).

[3] While road ownership was not adjudicated, the United States also maintains an interest in a 50-foot-wide access road along the right-of-way. *See* Dkt. #329.

[4] In fact, the record suggests that no such active use occurred. *See, e.g.*, Dkt. #395 at 56:1-5, 59:12-20, n.53; Dkt. #311 at 213:8-18, 253:13-16, 271:16-25.

**B.     The Tribe Initiated its Casino Project Without Regard for Cultural Resources, and Subsequent Expenses Must be Viewed in that Context**

Plaintiff claims that "[a]t every opportunity, the Tribe acted to identify, protect, and preserve any cultural resources that could be affected" in developing the Quechan Casino Resort. Dkt. #396 at 43:3-5. Even accepting that the Tribe incurred expenses (primarily in 2007) for cultural resource protection,[5] such expenditures do not support a conclusion that Tribe places a peculiar or otherwise heightened value on cultural resources, much less any basis for damages beyond the ranges offered by Dr. Bell.

Any protection and preservation efforts in the casino development must be viewed in light of the following undisputed facts, all of which occurred before the Tribe spent any money on cultural resource protection: (1) in 2004, the Tribe formally decided to build its massive casino resort near Pilot Knob, one of its most culturally sensitive sites; (2) as detailed in 2005 environmental reports and the Tribe's written discovery responses, the Tribe rejected multiple alternatives for new gaming facilities because they did not provide the same economic benefits as the Pilot Knob location; and (3) in 2006, the Tribe executed a Compact with the State of California which restricted new gaming operations to the Pilot Knob location absent the Governor's approval or a renegotiation of the Compact. Dkt. #395 at 11:10-13:7. While Plaintiff devotes several pages in its Brief to the expenses it purportedly incurred in late 2006 and 2007, it ignores this crucial context. Further, given the cultural importance of Pilot Knob (which Plaintiff emphasized in its 2002-2005 pleadings to this Court), it was foreseeable that the project would impact cultural resources and that such expenditures would be substantially higher than if the Tribe had elected to build new gaming facilities elsewhere.[6]

---

[5] Plaintiff's Brief and supporting exhibits support the conclusion that the Tribe received invoices or that its contractors estimated cost increases, but it is generally unclear whether these invoiced or estimated amounts were actually paid, or by whom.

[6] Evidence regarding the Tribe's cultural protection expenses is easily mischaracterized when the above context is ignored. As one illustration, Plaintiff

4

It was Plaintiff's decision to embark on a massive construction project near Pilot Knob prior to giving any consideration to cultural resource issues, just as it was Plaintiff's roughly coincident decision to file this lawsuit and allege the importance of Pilot Knob and the interconnectedness of Quechan cultural resources. A reasonable damage award must reflect the Tribe's own conduct, including its willingness to exchange casino revenue for impacts to cultural resources.

## C.   Applying the Perspective of Lorey Cachora, Plaintiff Destroyed Cultural Resources During Casino Development

Plaintiff argues, "[c]ontrary to the assertions of the United States, no cultural resource or site was destroyed as a result of the [casino] project." Dkt. #396 at 47:15-16. It is undisputed that the Tribe buried a cairn twenty feet below the casino food court, collected lithic scatters from the project area, and was unable to identify the current whereabouts of the scatters or related documentation. Dkt. #395 at 14:9-26. Defendant's conclusion that the Tribe destroyed cultural resources finds support in the perspective of the Tribe's own Rule 30(b)(6) designee on cultural matters, Lorey Cachora. At his 2015 deposition, Cachora, who was unaware that any lithic scatters were collected from the casino area, testified that collection of cultural resources deprives tribal members of access and amounts to "continuous destruction." Cachora Depo. at 54:1-55:7 (June 30, 2015); *see also id.* at 51:25-54:4; Ex. CV-2 – CV-3; Ex. CK-5. Cachora's testimony is

_____

emphasizes that in 2007, to address concerns of tribal members, it directed its contractor not to use fill material from the Old Borrow Pit near Pilot Knob. Dkt. #396 at 44:23-45:6. While Plaintiff claims this decision resulted in significant expense, it fails to mention the following: (1) the Tribe, through the Tribal Council, had previously leased the Old Borrow Pit to a mining company, which significantly disturbed the area; (2) the Construction Committee and Council initially *approved* the use of fill material from the site, despite its proximity to Pilot Knob; (3) use of materials from a more distant location was only more expensive in the context of this project because the Tribe had already decided to locate its casino near Pilot Knob (and the Old Borrow Pit). *See* Tr. at 647:8-648:5. Plaintiff also claims delays or project abandonment in 2007 would have had "significant cost implications." Dkt. #396 at 46:13-20. That the Tribe proceeded with the Pilot Knob casino demonstrates its willingness to make economic trade-offs for cultural resources, and supports application of Bell's real estate damage economics assessment.

5

consistent with his November 5, 2007 representations to the Tribe's historic preservation officer that collection and capping (*i.e.*, burial) of cultural resources "would be destroying them just as the [dirt moving] machinery would." Ex. CY-2; Nash Depo. at 260:16-261:22 (July 15, 2015).[7] Plaintiff's damages demand for Western's impacts (which did not include collection or burial) should be viewed in light of this evidence.

## III.   PLAINTIFF ASKS THE COURT TO REJECT MARKET VALUATION BY MISAPPLYING LAW AND MISCHARACTERIZING FACTS

Contrary to Plaintiff's contentions, Dr. Bell's market valuations are well founded and offer the Court a reasonable range of alternative damage assessments. While California courts generally look to market values in assessing damage to real property, s*ee* Dkt. #395 at 15:22-16:10, Plaintiff argues that the property at issue has no market value and that Bell's market value analysis would not adequately compensate the Tribe for the full extent of its property damage. As discussed below, both contentions fail.

### A.   The Land is Capable of Market Valuation

To show that the property at issue is not subject to market valuation, Plaintiff relies on (1) the property's location on the Quechan Reservation, (2) the alleged "uniqueness" of the property at issue and (3) mischaracterizations of Defendant's experts' testimony. Each of these bases is addressed in turn.

#### 1.   The Property's Location does not bar Market Valuation

Plaintiff asserts "as a legal matter" that market value is "an inappropriate and unrealistic measure of damages" given legal constraints on the conveyance of Reservation land. Dkt. #396 at 37:7-15. Plaintiff is mistaken in three respects. First, Plaintiff confuses land-alienation restrictions with land valuation: prohibitions on sales without the approval of the Secretary of Interior do not imply that land is immune to valuation. Second, the land-alienation restrictions did not prevent Bell from preparing an

---

[7] McAllister also indicated that the buried cairn and lost scatters can no longer be used for religious or cultural purposes by Tribal members. *See* Dkt. #395 at 20:19-21:5.

MAI appraisal of the subject property. Third, Plaintiff is legally incorrect, as courts have recognized market value of real property as a basis for compensation notwithstanding its presence on an Indian reservation. *Gila River Pima-Maricopa Indian Cmty. v. United States*, 467 F.2d 1351, 1357 (Ct. Cl. 1972) (holding that "diminution of fair market value" was the proper measure of damages even where Indian Community claimed it could not sell reservation land); *accord White Mountain Apache Tribe of Ariz. v. United States*, 10 Cl. Ct. 115, 117-18 (1986).[8]

> 2.   Plaintiff's "Uniqueness" Claims are Unsupported and Contradicted

In its Brief, Plaintiff asserts without supporting evidence that the cultural resources at issue are "unique." Dkt. #396 at 9:25-10:1, 11:21, 28:9-10; 31:25-26.[9] The Tribe's claims of "uniqueness" are contradicted by evidence that comparable cultural resources are abundant in the Tribe's vast aboriginal territory. *See* Dkt. #395 at 19:8-15, 20:19-23, 23:11-24:21, 39:1-19. Perhaps in an effort to undermine Bell's reliance on off-Reservation comparable properties, Plaintiff no longer emphasizes its "aboriginal territory," "aboriginal lands," "original land base" or "traditional territory," as it did in its Complaints in this case and in pleadings in the Glamis Gold litigation.[10] Now,

---

[8] In *Coast Indian Community v. United States*, 550 F.2d 639 (Ct. Cl. 1977), the court awarded compensation "based on the full market value of the right-of-way sale." *Id*. at 641, 653-654. Significantly, the court found the Community's MAI appraiser far more qualified than the opposing expert, whose assessment was "not well founded" and "entitled to little weight." *Id.* at 646-647; *see also Cal. Dep't Pub. Works v. 25.09 Acres of Lands*, 329 F. Supp. 230, 231, 239 (S.D. Cal. 1971) (incidentally recognizing that where land within the Fort Yuma Indian Reservation and held in trust by the United States has been condemned, compensation is set at "fair market value").

[9] Plaintiff's first and third assertions are each followed by an identical set of citations to the testimony of Meyer, Tomasi and Bell. *See* Dkt. #395 at 10:1-5, 28:10-15. None of these citations support its claims of "uniqueness." Plaintiff's second assertion is followed by a footnote that similarly does not support "uniqueness." *See id*. at 11 n.2. Plaintiff's final assertion lacks any citation. *See id*. at 31:26.

[10] *See, e.g.*, Dkt. #1 ¶¶ 7, 8, 14; Dkt. #41 ¶¶ 7, 8, 25; Dkt. #86 ¶¶ 7, 8, 25; Ex. EI-1 – EI-2, EI-5, EI-7 – EI-9 (where mining threatened abundant cultural resources in the

Plaintiff focuses narrowly on its Reservation, which it refers to as its "homeland."[11] *See* Dkt. #396 at 7:5, 37:17-18, 48:16-17. Regardless of Plaintiff's terminology, the record shows that Quechan cultural resources comparable to those damaged along Western's transmission line are abundant both within the Reservation and outside its boundaries where land can be bought and sold. *See* Dkt. #395 at 10:16-19, 23:13-24:21, 25:3-10.

### 3. Plaintiff Mischaracterizes the Testimony of Bell, McAllister, and Tomasi in Claiming that Market Value cannot be Ascertained

Plaintiff claims that Bell's testimony supports, or at least does not contradict, Plaintiff's contention that the property at issue lacks ascertainable market value. *See* Dkt. #396 at 28:23-24. In extremely misleading fashion, Plaintiff asserts, "Dr. Bell . . . testified that the resources lacked any market value." *Id.* at 29:6-8 (citing Tr. at 500:16-501:5). In reality, Bell rejected Plaintiff's contention that features of land can be valued like artifacts, independent of the land on which they sit. *Id.*[12] For Bell, by definition cultural features are part of the real estate. *Id.* at 396:1-22.[13] Further, Bell calculated the market value of the subject property at $2000/acre, a position clearly inconsistent with Plaintiff's claim that the property at issue lacks market value.

In similarly misleading fashion, Plaintiff asserts, "McAllister testified that the sites lacked commercial value." Dkt. #396 at 29:5-6 (citing Tr. at 553:16-554:8). McAllister's

---

Indian Pass area, the Tribe took action to prevent impacts, stating that it was "of no importance" that the area in question was 15 miles outside the Reservation).

[11] As discussed in Defendant's Post-trial Memorandum, the Reservation comprises only 8% of what the Tribe identified as its ancestral land base, Dkt. #395 at 10 n.2.

[12] At the beginning of the cited material, Bell politely rejects counsel's suggestion that the "cultural sites at issue here have no market value apart from the land they sit on." *See* Tr. at 500:16-19. Bell explains, "I would say what I've said, that you can buy land with these features or without these features, and either way, you're going to pay about $2,000 an acre." *Id.* at 500:19-22. At no point in the cited exchange does Bell use the phrase "market value," and certainly not in reference to the anti-definitional notion of cultural sites separate and apart from the land on which they sit.

[13] Bell explained that, unlike cultural features, which are part of the real estate, artifacts are personal property and outside his area of expertise. Tr. at 396:12- 22.

8

testimony addressed "commercial value" within the meaning of ARPA, not the market valuation of real property. As McAllister explained, the ARPA definition applies to artifacts, not land, and his conclusion that an ARPA "commercial valuation" could not be conducted for the sites at issue does not undermine Bell's market valuation. *See* Tr. at 553:16-554:12. Plaintiff also inaccurately claims that Dr. Tomasi agreed with its position that the property's market value cannot be ascertained. Dkt. #396 at 29:4-5 (citing Tr. at 352:9-11). Contrary to Plaintiff's suggestion, Tomasi did *not* contend that a market valuation of land containing cultural sites was not possible. In fact, he explicitly testified that market data for nearby properties with cultural sites would constitute valid, objective economic data, Tr. at 364:8-465:1, and criticized Meyer for failing to consider land acquisition as a restoration action, Dkt. #395 at 58:9-13.

### B.   In Attempting to Discredit Bell's Analysis, Plaintiff Misapplies Environmental Caselaw and Distorts Bell's Methods and Results

Plaintiff's argument that Bell's market value analysis would not adequately compensate the Tribe is based on three fundamental errors: (1) misapplying environmental caselaw; (2) perverting Bell's use of monetization; and (3) mischaracterizing Bell's land sale analysis.

### 1.   Plaintiff Misapplies Environmental Caselaw

While subject matter jurisdiction in the immediate FTCA case is based on 28 U.S.C. § 1346(b)(1) and Plaintiff's suit is specifically based on "injury or loss of property," Plaintiff relies on environmental cases in which recovery is not limited to "property damage." In *United States v. Union Pacific Railroad Company*, 565 F. Supp. 2d 1136 (E.D. Cal. 2008), the court explained that in light of the broad statutory language of Health and Safety Code § 13007 and its history of liberal construction, "courts have not read § 13007 as limiting a plaintiff's recovery [in fire-related environmental cases] to property damage only." *Id.* at 1143-44. Accordingly, the court held that, apart from property damage, a broad range of "separate and identifiable [fire-related environmental] injuries" was also recoverable. *See id.* Plaintiff also relies on two

9

marine habitat damage cases brought by the United States under the Marine Protection, Research and Sanctuaries Act, a statute which specifically authorized broad recovery beyond property damage. *United States v. Great Lakes Dredge & Dock Co.*, 259 F.3d 1300 (11th Cir. 2001) and *United States v. Fisher*, 977 F. Supp. 1193 (S.D. Fla. 1997) (relying on 16 U.S.C. §§ 1431 *et seq.*). Similarly, the separate injuries recoverable in *Commonwealth of Puerto Rico v. SS Zoe Colocotroni*, 628 F.2d 652, 671 (1st Cir. 1980) were based on a statute explicitly permitting recovery for the value of "damages to the environment and/or natural resources."

Unlike the government plaintiffs in these cases, Plaintiff does not rely on an authorizing statute beyond the FTCA and California's general statutes for recovery in tort. Nothing brings this case within the scope of environmental law or authorizes the Tribe to recover for "separate and identifiable injuries" apart from property damage.

### 2.   Monetization is not a Condition for Tribal Recovery

Plaintiff attempts to transform Bell's observation that only some kinds of cultural resources can be monetized into a false requirement that the Tribe monetize its resources to qualify for recovery. *See* Dkt. #396 at 32:15-18. Neither Bell nor the United States have suggested that Plaintiff's recovery should turn on whether the Tribe chose to monetize its resources. While Bell concluded that land can be bought for the same price with or without the cultural resources at issue, his analysis did not end there, as he determined the subject property's per-acre market value and calculated its market value with and without the ROW acreage.[14] Using Bell's approach, the Court may award the Tribe all or a portion of the market value of the subject property itself.

─────────────────────

[14] In explaining market value, Dr. Bell did not dismiss or minimize the spiritual value of property. He explained that in teaching a course to real estate professionals, he would use a piece of quartz to explain the difference between market value and spiritual value. Tr. at 462:15-463:1. Some persons may value the quartz for its beauty, others for its use in making watches, and others for its great spiritual significance. *Id.* at 463:4-11. If a piece of quartz has a market value of $100, the market value is the same regardless of a person's motivations for buying it. *Id.* at 463:12-464:1. Although some people

3.   <u>Plaintiff Mischaracterizes Bell's Land Sale Analysis</u>

Plaintiff does not question Bell's expertise in real estate damage economics, but apparently misunderstands his profession's reliance on market sources and other experts, in this case Dr. Dore.[15] Plaintiff presents no evidence that Dore misinformed Bell. Nor does Plaintiff present evidence that BLM's cultural site designations, information and signage at Blythe and Sears Points were incorrect or that BLM or other sources misinformed Bell concerning land sale practices. *See* Dkt. #395 at 23:13-16 n.15.

Nonetheless, Plaintiff argues that the United States is relying on "lay opinion" that there are "comparable cultural sites" outside the Reservation. *See* Dkt. #396 at 34:26-35:2. Of course, no two Quechan sites are going to be identical. But it is absurd for Plaintiff to suggest that its ancestral lands outside the Reservation do not include sites "comparable" to the sites at issue. The Tribe's pleadings, its Glamis Gold NAFTA submission, the WCRM report, the AES cultural reports prepared for the Tribe, Dore's Assessment and Analysis (Ex. CB6) relied upon by Bell, and Dore's and Cachora's liability trial testimony all show that the cultural sites at issue are a very small part of a vast aboriginal territory (including extensive land beyond the Reservation boundaries) that includes "hundreds of thousands" of Quechan sites. Dkt. #395 at 23:13-24:12.[16]

---

would place enormous or even "priceless" spiritual value on the quartz, they could still purchase it for $100. *Id.* at 463:19-464:4.

[15] *Compare* Dkt. #396 at 34:26-35:2 *with* Dkt. #395 at 22 n.12, 23:13-16; *see* Ex. CB6; Ex. CB8-1 – CB8-3.

[16] These sites include those at Indian Pass and at two-thirds of Pilot Knob, areas of undisputed cultural significance that are outside the Reservation, owned by BLM, rich in the kinds of resources found at the sites at issue, and also include extensive geoglyphs. Dkt. #395 at 19:8-15, n.11, 24:12-21, 25:21-26:14; *see also* Tr. at 424:7-427:19; Ex. CB10-12 – CB10-14 (geoglyphs at Blythe). McAllister testified that the cultural resources found at the casino location near Pilot Knob were very similar to the archaeological sites Western impacted during its pole replacement project, with the possible exception that casino resources were *more* significant given their relative proximity to Pilot Knob. Tr. at 568:5-575:5.

11

Contrary to Plaintiff's suggestions, Dkt. #396 at 37:18-21, Bell explicitly recognized that any choice of replacement land must be made by the Tribe.  Tr. at 410:25-411:7. The 10 land sale parcels, which are close to the subject property and comparable for market valuation purposes (not necessarily spiritual purposes), form the basis of his market value calculations. Tr. at 466:18-472:14, 473:16-479:6; Ex. CB-14 – CB-16; Ex. CB10-33. Neither Bell nor the United States have suggested that the Tribe should use its damage award to purchase any of the 10 land sale parcels or, for that matter, any replacement property at all. *See* Tr. at 397:23-398:8. While replacement property is available, it is the Tribe's decision to use any damage award as it sees fit.

In summary, had Bell stopped his analysis with his finding that the cultural resources at issue had neither a positive nor a negative effect on the market value of the property, his analysis would likely have been inadequate to support an appropriate award of damages. Here, however, Bell determined the market value of the subject property itself. Under the facts of this case, where plaintiff dropped its claim for emotional distress and proved no significant active use of the property at issue, Defendant respectfully submits that Bell's market analysis offers the Court a reasonable and adequate range from which to choose an appropriate award.

## IV.  IF THE COURT REJECTS MARKET VALUATIONS, MCALLISTER'S PROJECTED COST OF RESTORATION AND REPAIR ASSESSMENT UNDER ARPA IS A RELIABLE MEASURE OF PLAINTIFF'S DAMAGES

Plaintiff's primary critique of Martin McAllister's damage assessment is that the Tribe's case is not brought under ARPA. The United States concedes this point, but as explained in Defendant's Post-trial Memorandum, McAllister's ARPA-based assessment is a reliable measure of Plaintiff's tort damages because, *inter alia*, projected restoration and repair measures address the actual impacts to the archaeological (or cultural) sites at issue. Every projected action that formed the basis of McAllister's assessment—fencing, gates, signs, archaeological consultation and monitoring, and tribal blessing ceremonies—are in direct response to the actual damage incurred from Western's actions

and the protective actions necessary to prevent future damage (including from sources other than Western), thereby restoring the sites for future use by the Tribe and the public. Thus, if the Court rejects Bell's market-based valuations, McAllister's assessment would be a reliable measure of compensating Plaintiff for the detriment proximately caused by the pole replacement project. *See, e.g.*, Cal. Civ. Code § 3333; Dkt. #395 at 30:15-33:15.

While Plaintiff's primary criticism of McAllister's assessment is that this is not an ARPA case, it also criticizes McAllister's assessment because it does not include (1) emergency restoration and repair costs, (2) the costs of preparing his expert report, and (3) an "archaeological value" determination. Dkt. #396 at 39:25-42:2. These criticisms are without merit, as McAllister's projected restoration and repair measures addressed the actual damage at issue, whereas the measures identified by Plaintiff do not.

## A.   Emergency Restoration and Repair Costs

Plaintiff argues that if the Court adopts an ARPA-based damages methodology, it should award the Tribe an additional $40,642.25, the amount of emergency restoration and repair costs McAllister calculated in 2001. *See* Dkt. #396 at 40:9-11. While accounting for emergency costs of restoration and repair may be consistent with a mechanical application of the Uniform Regulations in an ARPA civil penalty case,[17] Plaintiff does not (and cannot) explain how this amount bears any rational relationship to compensating it for the damages at issue in its tort claim against the United States. For example, Plaintiff demands in excess of $15,000 for Doyel and Ryan's salaries and time in preparing the 2001 URS Report, an amount that was *already paid* by Western 17 years ago. *See* Ex. 73 at 11; Tr. at 559:9-560:7. The majority of the remaining expenses include salaries and travel costs of Western employees and McAllister himself, which

---

[17] Plaintiff effectively argues for a mechanical application of ARPA's civil penalty provisions, as if this an ARPA case in which a Federal Land Manager (acting on behalf of the United States) is seeking reimbursement of expenses associated with addressing damage to archaeological resources. *See, e.g.*, 16 U.S.C. § 470ff; 43 C.F.R. § 7.15.

were already paid by the United States and, like Doyel and Ryan's salaries, bear no relation to any measures required to make the Tribe whole. *Id.* at 9-11. Requiring the United States to *repay* these costs, only this time to the Tribe, would not compensate Plaintiff for the injury it suffered, but would, in fact, amount to an arbitrary award in the context of an FTCA damages claim. McAllister's ARPA-based damage assessment, which rationally focused on the projected costs of restoration and repair, is a reliable measure of Plaintiff's damages, and there is no legal or factual basis to add a 17-year-old emergency cost assessment to a tort damage award.[18]

### B. Costs of Preparing Expert Report

Plaintiff also claims that McAllister's costs of preparing his December 2015 expert report ($21,207.48) should be the basis of an upward adjustment in any ARPA-based award. Dkt. #396 at 40:18-19. As with the 2001 report, Plaintiff cannot explain how this amount bears any rational relationship to compensating it for the damages at issue in its tort claim against the United States. The Court's task is to reasonably compensate Plaintiff under the FTCA, not mechanically apply ARPA no matter how nonsensical the result. As discussed *supra*, the projected restoration and repair measures proposed by McAllister, including the preparation of a report related to the installation of fencing and gates around the transmission line sites, *see* Tr. at 565:18-566:8, are directed toward making the Tribe whole and preserving and protecting the ten injured sites into the future. The amount the United States paid McAllister to prepare a written report for this litigation bears no connection to making Plaintiff whole as a result of Western's conduct. *See* Tr. at 618:7-16.

---

[18] McAllister's assessment was *rationally* focused on the *projected* costs of restoration and repair, particular given that in the 17 years since the 2001 report, the sites were subject to additional disturbances, such as ORV impacts. Tr. at 559:14-560:20.

14

### C.     "Archaeological Value"

Plaintiff also criticizes McAllister for failing to conduct an "archaeological value" determination under ARPA.[19] Assessing "archaeological value" entails a hypothetical, speculative scenario for retrieving scientific information from archaeological resources as if damages never occurred, and is therefore not reflective of the Plaintiff's tort damages in this case. Tr. at 554:13-555:20, 617:17-618:6; Dkt. #395 at 34:24-36:2. Courts widely agree with McAllister's testimony that archaeological value assessments are inherently hypothetical and speculative. *Id.* at 35:13-36:2; *see also, e.g.*, *United States v. Hunter*, 48 F. Supp. 2d 1283, 1288, 1292-93 (D. Utah 1998) (characterizing "archaeological value" as "intangible" and a "fiction").

In any event, the record supports a conclusion that any valuation of cultural resources by Plaintiff (peculiar or otherwise) does *not* include "archeological value" as defined by ARPA, and including "archaeological value" in a damage award would not be just and equitable. Cachora testified that the Tribe has no interest in the hypothetical excavation and retrieval of scientific information inherent in an "archaeological value" determination. *See* Cachora Depo. at 54:1-55:2 (June 30, 2015). Moreover, when McAllister was retained by Western in 2001, tribal representatives stipulated that they did not want an archaeological value determination conducted. Tr. at 555:21-556:10, 602:8-603:1; Ex. 73 at 7. Accordingly, the Court should reject Plaintiff's argument that it is entitled to an upward adjustment in an ARPA-based damages award.[20]

---

[19] Plaintiff also asserted, without support, that McAllister "failed" to include a "commercial value" assessment, Dkt. #396 at 40:20-21. A commercial value assessment under ARPA was neither plausible nor required in this case. Dkt. #395 at 36:3-37:2.

[20] Plaintiff also asserts McAllister's assessment is unreliable because "he failed to consult in any manner with the Quechan Tribe." Dkt. #396 at 42:3-4. Not only is this criticism disingenuous, as it would be inappropriate for Defendant's agent to consult with Plaintiff during active litigation, but it is also misleading. McAllister considered actions taken by Plaintiff with respect to similar cultural resources at the casino area, and directly incorporated the Tribe's approach to cultural resource protection into his assessment. Dkt. #395 at 33:16-34:11. Further, McAllister *did* consult with the Tribe in 2001, prior to the filing of this lawsuit. *See* Ex. 73 at 4-5, 7, 8.

## V. TOMASI IS THE ONLY CREDIBLE EXPERT ON NATURAL RESOURCE DAMAGE ECONOMICS, AND MEYER'S DAMAGE ASSESSMENT IS FUNDAMENTALLY UNRELIABLE

Not only is Dr. Tomasi supremely qualified to critique Meyer, but Plaintiff's efforts to hide the defects of Meyer's work behind notions of Quechan cultural reality lack foundation and are contradicted by the record. That Plaintiff now calls Meyer's method a "modified" REA does not obscure the fundamental flaws in his assessment.

### A. Tomasi is Supremely Qualified to Critique Meyer's Assessment

Plaintiff claims Meyer has decades of experience conducting damage assessments, but ignores his testimony that he had *never* conducted a *monetary* resource damage assessment (on cultural resources or otherwise) before his work in this case. Tr. at 41:4-6. This was also the first complete REA analysis Meyer ever conducted. *Id.* at 37:9-14. On the other hand, Dr. Tomasi has conducted dozens of NRDAs, HEAs, and REAs in his career and, in recent years, has written extensively on the topics in peer-reviewed publications. *Id.* at 222:16-18, 226:7-14, 232:13-234:1. Tomasi also has deep knowledge and experience in other NRDA methods, such as revealed preference and stated preference (*i.e.*, contingent valuation). *Id.* at 220:25-221:11, 223:2-224:15, 231:1-232:10, 234:2-237:23. Several of the professional authorities purportedly relied upon by Meyer include citations to Tomasi's work.[21]

Without citation, Plaintiff attempts to impugn Tomasi's credibility by arguing that because the majority of his current work is for private sector clients seeking to reduce their liabilities, he sets "artificial," "unrealistic," or "unattainable" standards for plaintiffs to achieve. Dkt. #396 at 24:18-25. Plaintiff overlooks Tomasi's distinguished academic credentials, including as a faculty member, his peer-reviewed writings, and his extensive experience working on behalf of governments and international organizations (not just private sector clients). Tr. at 220:19-222:5, 232:13-234:1, 235:16-237:3; *see also* Exs.

---

[21] *See, e.g.*, Ex. DN-2 (cited by Meyer at Ex. 26-815 n.31); Ex. CD20-2 (cited by Meyer at Ex. 26-815 n.27); Ex. DP-10 (cited by Meyer at Ex. 26-814 n.26).

CA1 and CA2. Tomasi also has extensive experience assessing tribal and cultural use issues in the context of NRDA, including REAs and HEAs. Tr. at 228:23-230:13. Moreover, properly quantifying an injury, isolating that injury from other harms, identifying restoration actions that will produce like-for-like resources or services, and investigating available economic data are not artificial, unrealistic, or unattainable standards; they are *fundamental* to and *definitional* of NRDAs in general, and REAs in particular. *See generally* Dkt. #395, Part VI.B. Meyer's failures to implement a valid REA are confirmed by reference to well-established legal and professional standards, not the whims of private industry. *See id.* Likewise, Meyer's elicitation procedure failed in multiple, fundamental respects to meet the well-documented, decades-long concerns of economists and social scientists. *See id.*, Part VI.B.3. That Meyer had a challenge in assessing damages does not excuse his myriad failures to adhere to the standards of resource economics. *See, e.g.*, Tr. at 335:19-337:9, 378:24-379:5, 380:12-17.

### B. Rather than Produce an Objective Economic Assessment, Meyer Relied on Notions of Quechan Cultural Reality, an Area in which he Lacked Expertise, and Let Plaintiff Dictate his Process and Results

Meyer's experience with other native or indigenous populations did not make him specially equipped to conduct a damage assessment in this case. While Meyer was accepted by the Court as an expert in resource economics, Tr. at 47:8-9, he is *not* an expert on Quechan culture. This case was the *first* time in his career in which Meyer worked with the Quechan Tribe. *Id.* at 49:21-22. Unless Quechan cultural perspectives are identical to the perspectives of other indigenous populations with whom Meyer has worked in Hawaii, Washington, and elsewhere, Meyer had no special qualifications (other than his qualifications as a resource economist) to produce a damage assessment for Plaintiff.[22] Moreover, Meyer testified at trial that the Quechan Tribe has a "basic

---

[22] To the extent Meyer simply applied the cultural perspectives of these non-Quechan indigenous groups to his assessment in this case, it would amount to "cultural encapsulation," as he defined it in his testimony. *See* Tr. at 61:3-19.

17

mistrust" of non-tribal experts (which would include Meyer himself). *See id.* at 104:5-10. Despite his lack of relevant expertise, Meyer and Plaintiff repeatedly answer critiques of his method not by reference to principles of resource economics, but by insisting that his methods are unassailable because they were dictated by Quechan cultural perspectives or the perspectives of indigenous populations generally.

For example, in response to criticisms that Meyer failed to consider the acquisition of land as an appropriate restoration action in the second step of REA, they claim any attempt to explore land acquisition or market values of nearby land would have constituted "cultural encapsulation" and would have ignored "Quechan cultural reality." Tr. at 114:25-115:24; Dkt. #396 at 37:18-21. As discussed above, Meyer was accepted by the Court as an expert in resource economics, *not* Quechan cultural reality. While Meyer testified that cultural resources are, "according to the Quechan," not "exchangeable," Tr. at 115:6-7, that assertion is contradicted by the record. Plaintiff's decision to affect or impact dozens of cultural resources in exchange for casino revenue and, more broadly, economic gain is the most obvious example that Quechan cultural resources are "exchangeable." *See, e.g.*, Dkt. #395 at 19:7-22:10, 40:12-41:1, 60:12-23. Moreover, Quechan cultural resources are abundant in the Tribe's aboriginal territory, and nearby land with comparable cultural features is available for sale. *See id.*, Part IV; *supra* at Part III. Land acquisition is a commonly considered restoration action in REA, and Meyer's explanation lacks credibility. *See* Dkt. #395 at 58:7-59:9.

Similarly, in response to criticism that he failed to conduct a systematic investigation into active use of cultural resources, Meyer asserts that such investigation would have been "an inappropriate way to deal with tribal people" and an example of "cultural encapsulation." Tr. at 139:15-140:9; *see also* Dkt. #343-2 at 7:21-8:2. Notably, Meyer's explanation appears to be based on his experience working with *other* tribes. Tr. at 139:15-141:17. Despite the admitted relevance of active use to his assessment, his adoption of active use restoration actions in his purported REA, and the valuable

information resource economists glean from active use data,[23] Meyer eschewed an investigation into Quechan active use based on little more than the cultural perspectives of *other* indigenous populations. As with his dismissal of land acquisition, Meyer's explanation with respect to active use lacks credibility.

Defendant does not argue that a monetary damage assessment must disregard tribal perspectives; Bell, McAllister, and Tomasi all testified that such perspectives should be considered.[24] But Meyer did not simply consider Quechan perspectives. Instead, notions of Quechan cultural reality dictated his process and results. Meyer's testimony regarding his assessment of "equivalence" is particularly revealing:

> Q. In your expert opinion, do you believe it was appropriate to consult with the Quechan about equivalence?
> A. Yes. . . .
> Q. In your view, is there any other group of people who could accurately determine equivalence here?
> A. Not for the Quechan.
> Q. Is there any other group besides Quechan that understands the level of cultural services provided by the affected resources?
> A. No.
> Q. ***And if a person outside the Quechan culture does not understand or comprehend the services provided by the resources, how could they properly – could they properly assess or determine equivalence?***
> A. ***They couldn't.***

---

[23] *See, e.g.*, Dkt. #395 at 59:10-60:11 (failure to conduct active use investigation); Tr. at 57:3, 134:19-136:7, 139:1-14 (admitting resources at issue had active use element and he sought a "general sense" of such active use from Mr. Cachora); *id.* at 74:14-16, 81:16-82:4, 100:3-8, Ex. 26-825, 26-827 (active use restoration actions).

[24] *See, e.g.*, Tr. at 256:3-257:10. 280:25-282:12, 344:12-346:21 (Tomasi testifying that tribal members could be consulted to identify cultural services associated with resources or restoration actions); *id.* at 397:23-398:8, 410:23-411:7, 483:24-484:6 (Bell testifying that Tribe could provide ultimate conclusion on significance of cultural sites and that it is appropriate to obtain input from damaged party); *id.* at 577:22-578:22, 582:18-584:14, 591:5-593:16 (McAllister testifying that his costs of fencing and ceremonies accounted for the Tribe's demonstrated treatment of similar resources).

Tr. at 102:23-103:19 (emphasis added). This exchange, perhaps more than any other, demonstrates the fundamental problem with Meyer's expert testimony. His position, effectively, is that Plaintiff is entitled to whatever compensation it demands. His assessment does not depend on NRDA, REA, or any other objective, viable economic methodology. Rather than deliver an objective assessment to the Court based on the professional standards of resource economics, Meyer viewed his task as producing an assessment "considered fair and reasonable" by Plaintiff. *See* Tr. at 174:6-13.

C.   **For the First Time, Plaintiff Claims Meyer Devised a "Modified" REA; Regardless of Labels, Tomasi's Critiques Remain Valid and Meyer's Departures from REA Practice were Unacceptable**

Plaintiff has insisted throughout the damages phase of this litigation that Meyer conducted a valid REA and rejected other economic methodologies in producing his assessment.[25] In none of their pre-trial filings did Plaintiff or Meyer claim that he conducted a modified or adaptive REA or an REA hybrid that incorporated other damage assessment methods. Meyer specifically testified at trial that he followed each and every step of the REA process and eschewed other methodologies, and never claimed to have conducted a modified, adaptive, or hybrid approach. Tr. at 40:11-18, 51:19-22, 62:5-17.

Now, for the *first* time in its Post-trial Brief, Plaintiff appears to concede that Meyer did not conduct a true REA; rather, Plaintiff asserts that Meyer conducted an REA "as modified to adapt to specific Quechan circumstances . . . ." Dkt. #396 at 18:12-13. According to Plaintiff, then, not only was this Meyer's first monetary damage assessment and first REA, but he effectively modified his assessment methodology based upon Quechan cultural reality, an area not within his expertise and which he claimed could be understood only by tribal members. *See* Tr. at 102:23-103:19.

Plaintiff's newly conjured description of Meyer's method appears to be part of an attempt to sidestep Tomasi's critiques. Plaintiff cites an exchange with the Court in

---

[25] *See, e.g.*, Dkt. #343 at 17:2-5, 17:16-17, 21:2, 22:5-7, 27:3-30:23; Dkt. #343-2 at 8:12-13, 8:20-9:12, 9:13-16; Dkt. #373 at 9:22-12:22, 20:9-13.

which Tomasi acknowledged that economic methods may need to be adapted to fit the particular circumstances at issue. Dkt. #396 at 26:8-27:6 (quoting Tr. at 381:21-383:9). The basis for the Court's questions appeared to be whether a hybrid REA/stated preference method could be appropriate in this case.[26] Tr. at 381:25-382:21. Tomasi agreed such an approach was possible, and cited to his previous testimony in which he had discussed the appropriateness of eliciting information from the Cultural Committee about cultural features, within REA constructs. *Id.* at 382:22-383:2. Tomasi also testified it would be appropriate to consider a "degree of hybrid" of various features of REA, including the use of group discussions. *Id.* at 383:3-9.

Crucially, Plaintiff *omitted* the last portion of Tomasi's response to the Court's inquiry, in which he specified that even assuming that a hybrid methodology could be applied, Meyer *failed* to meet the standards of the profession:

> My opinion is that that hybrid would have involved a degree of exploration, a degree of design, a degree of investigation and testing, a degree of recognition of all these problems in the literature with the elements that you're drawing on in order to do the best possible job at doing this. And with all due respect to Mr. Meyer, I don't see evidence of all of those attempts to build an approach that is a hybrid that makes best use of all our professional knowledge. I see something that doesn't rise to that standard in my understanding of what was done and how it was developed and how it was applied. So that's the basis of my opinion today.

*Id.* at 383:10-22. Throughout the entirety of his discussion with the Court, Tomasi repeatedly emphasized that even where economic methods are adapted to meet the circumstances at issue, damage assessments must still be conducted in accordance with

---

[26] Given Meyer's explicit insistence that he rejected a stated preference (*i.e.*, contingent valuation) method, Tr. at 51:19-22, 207:13-19, it is bizarre that Plaintiff would attempt to use this exchange to bolster his credibility. Regardless, Tomasi's acknowledgment that an REA/stated preference hybrid could be appropriate does not undermine his many critiques of Meyer's elicitation. *See* Dkt. #395, Part VI.B.3.

professional standards, and regardless of design, economists have a duty to accurately and reliably measure damages. *Id.* at 378:18-379:5, 380:12-17, 381:2-7.

Plaintiff's rebranding of Meyer's method as a "modified" REA also supports its argument that Meyer was not required to engage in a strict quantitative analysis. *See* Dkt. #396 at 27:9-16. By definition, however, an REA requires the implementation of two inherently quantitative steps, including *quantification* of the injury in *measurable* terms[27] and the identification of restoration actions that provide resources or services *equivalent* to those lost due to that injury. Tr. at 240:1-15, 242:4-8, 243:3-16. These definitions are not simply a matter of expert opinion; they are provided in federal regulations and the professional literature and BLM Handbook upon which Plaintiff and Meyer rely.[28] Contrary to Plaintiff's misleading characterizations, Tomasi *never* conceded that the definitional, quantitative elements of REA can be abandoned.[29]

---

[27] Plaintiff and Meyer *wrongly* state that the first step of REA is to "identify and describe" the injury. Dkt. #396 at 18:6; Tr. at 62:5-9. On the contrary, Tomasi testified that the first step in REA is to *quantify* the injury. *See* Tr. at 242:4-8.

[28] *See, e.g.*, 43 C.F.R. §§ 11.14(v) (defining "injury" as a "measurable adverse change"), 11.70(a) (requiring that injury be quantified by reference to the baseline condition), 11.80(b) (measure of damages is "the replacement and/or acquisition of equivalent natural resources"); Ex. CD20-2 (first step in REA is to "quantify the injury in terms of degree (% of baseline injured), duration (years until recovery), and size (# of acres, stream miles, birds, etc.)," while second step is to "quantify the benefits of a restoration project in similar terms"); Ex. CD22-2 (must use "appropriate metric, a single measurable attribute of a resource or service that has been injured or lost"); Ex. DN-2 (first step in REA is to "quantify the natural resource injury," while the second step is to provide a restoration project "scaled" to "offset" the losses resulting from the injury).

[29] There are multiple other instances in which Plaintiff mischaracterizes Tomasi's testimony. First, Tomasi did not concede that assessing damages to cultural resources is more complex than in the pelican example he illustrated for the Court; rather, he stated such assessments are different, each with their own complexities and challenges. Tr. at 347:23-348:5; *see also id.* at 367:11-14. Second, while Tomasi testified that he could not determine whether quantitative modeling was feasible in the circumstances of this case, he also testified that if it wasn't feasible, some other, non-REA method was required, and Meyer did not conduct a true REA. Tr. at 347:1-14. Third, while Tomasi conceded that Meyer counted impacted cultural sites and features, *id.* at 349:17-350:6, he did *not*

As with REA itself, Meyer's task here, as a resource economist, was inherently *quantitative*: to present an expert opinion on the appropriate *amount* of *monetary* damages the Tribe should be awarded. Tr. at 66:9-13. Plaintiff now asserts that Meyer was permitted to deviate, to some undefined extent, from a quantitative analysis in his purported REA.[30] As described in Defendant's Post-trial Memorandum, Meyer's novel approach to REA quantification manifested itself in a lack of cognizable metrics or coherent theory of measurement, an arbitrary aggregation of cultural sites, and restoration actions that did not provide equivalent resources or services to those lost. *See* Dkt. #395 at 43:6-50:3, 54:1-56:15. Meyer's "modified" REA and resulting assessment should be rejected as unreliable.

## D. Meyer's Assessment is Fundamentally Defective

The United States addressed the myriad problems with Meyer's damage assessment in its Post-hearing Memorandum. Plaintiff's arguments in its own Brief bring three such deficiencies into even starker relief.

First, Plaintiff claims Meyer reviewed prior archaeological reports "relating to the condition of the sites before and after the impacts." Dkt. #396 at 19:7-8 (citing Tr. at 71:25-72:6). Notably, Meyer testified that he reviewed the work of URS and EDAW (Cleland), but did not mention WCRM. Tr. at 71:25-72:6; *see also* Dkt. #343-2 at 6:20-7:2. Unlike URS and EDAW, WCRM conducted its survey of the sites at issue *before*

---

concede that Meyer's approach was a proper quantification under step one of REA, Dkt. #395 at 45:13-49:10. Fourth, Plaintiff claims literature from Dr. Adamowicz suggested that REA methodology may require flexible application in appropriate circumstances. Dkt. #396 at 26:3-6. Both Meyer and Tomasi testified that Adamowicz's work addressed the challenges associated with surveying indigenous populations, not the flexibility of REA application. Tr. at 57:25-59:7 (Meyer), 327:18-328:15 (Tomasi).

[30] Contrary to Plaintiff's suggestion, Dkt. #395 at 27:9-11, Tomasi does *not* advocate a "quantitative-only" REA devoid of qualitative analysis. For example, he testified that REAs require consultation with subject matter experts about the affected resources, restoration actions, and associated services, *i.e.*, with biologists where pelicans are killed by an oil spill, or with tribal members when the injured resource provides cultural services. Tr. at 254:17-257:10. 280:25-282:12, 344:12-346:-21.

the pole replacement project, so any competent study of pre-project conditions demanded intensive review of WCRM's work.[31] Meyer's disregard of the sites' baseline conditions rendered his REA fundamentally defective. *See* Dkt. #395 at 50:4-53:14.

Second, Plaintiff claims that Meyer's meetings with Quechan respondent groups, including members of family groups, provided a "broad representative cross-section of Quechan respondents." Dkt. #396 at 20:11-16 (citing Tr. at 96:16-98:8). When the cited testimony is scrutinized, however, it reveals a remarkably unscientific approach: Meyer deferred to the Cultural Committee as to whether there were particular individuals he should include in his elicitation meetings; he met with 31 "family/kinship groups," a number derived, without explanation, from an initial count of 12 kinship groups and 41 family groups; meetings were facilitated by the Cultural Committee, with "invitations" to "please come"; the extent of family/kinship participation at each meeting was inconsistent; and others "interested" in the cultural issues being discussed were permitted to attend and participate, without apparent limitation. Meyer's informal effort, largely dictated by Plaintiff's members most interested in cultural issues, does not withstand even cursory scientific scrutiny and could not, "unless by serendipity," have obtained a fairly representative view on cultural issues. *See* Tr. at 324:25-325:17. Any argument that alternative methods were unavailable (or contrary to Quechan cultural reality) is contradicted by the record.[32]

Third, Plaintiff asserts that Meyer "took steps to ensure that the appropriate remedial actions would be correlated only with the damage caused by WAPA during the

---

[31] While Meyer mentioned the WCRM report in a footnote in his report, he did so to identify the site numbers. Ex. 26-809 n.5.

[32] The Tribe holds elections in which enrolled members are contacted and vote on an individualized basis. Hundreds of Quechan Tribal members voted in a referendum on whether construction of the casino near Pilot Knob should proceed given the presence of cultural resources. That Meyer never even considered, much less tested, the option of individualized discussions or broad opinion surveys demonstrates the extent to which he fell short of professional standards. *See* Dkt. #395 at 70:3-71:13. That Meyer's elicitation concluded prior to the vote does not excuse his failures, as he signed his report in 2015.

pole replacement project." Dkt. #396 at 21:13-15 (citing Tr. at 101:7-102:10). Among those steps, Plaintiff cited the following testimony from Meyer: "throughout the conversations, I encouraged the Quechan respondents to be reasonable and fair in the remedial proposals that they were making. And whenever I got an opportunity, I would bid them down, kind of say, well, gee, don't think you that's a bit much and so on." Tr. at 101:21-25. In other words, Meyer politely requested that Plaintiff's members not make excessive demands. One does not need a Ph.D. in natural resource economics to recognize that this request did not ensure a reliable assessment.[33]

## VI.    CONCLUSION

For the foregoing reasons, the Court should accept the market-based valuations set forth by Dr. Bell. In the alternative, the Court may consider Mr. McAllister's ARPA-based projected cost of restoration and repair assessment.

Dated:  May 11, 2018                          Respectfully submitted,

NICOLA T. HANNA
United States Attorney
DOROTHY A. SCHOUTEN
Assistant United States Attorney
Chief, Civil Division
ROBYN-MARIE LYON MONTELEONE
Assistant United States Attorney
Chief, General Civil Section

/s/ *Thomas K. Buck*
THOMAS K. BUCK
Assistant United States Attorney
DAVID GORLIN
Special Assistant United States Attorney

Attorneys for Defendant United States of America

---

[33] Dr. Tomasi nevertheless testified that bidding games (which Meyer was purportedly attempting) are discredited in the field. *See* Tr. at 329:19-331:20.