UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUECHAN INDIAN TRIBE,<br><br>                                   Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>                                   Defendant. | Case No.: 02cv01096 JAH-MDD<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER** |

## INTRODUCTION

Plaintiff Quechan Indian Tribe (hereafter "Quechan" or "the Tribe") seeks damages, and injunctive and declaratory relief, against Defendant United States of America for Western Area Power Administration employees' conduct of knowingly, recklessly, or negligently driving heavy equipment over, across and through cultural resources[1], resulting in permanent scarring upon the resources on the Fort Yuma Reservation during power pole replacements along the Gila-Knob powerline. Following a bench trial, the Court found Defendant liable for damage caused to ten separate cultural resource sites.

---

[1] The term "cultural resources" used herein includes the full suite of cultural features and artifacts present within the impacted sites that have cultural, spiritual, historical, educational and public appreciation value and significance to the Quechan population. Six of the resources are eligible for listing on the National Register of Historic Places, such as lithic scatters, cairns and cobble clusters.

Thane Somerville appeared on behalf of Plaintiff and Thomas Buck and David Gorlin appeared on behalf of Defendant at a trial to determine damages. Plaintiff, through its expert, Philip Meyer[2], advanced a modified Resource Equivalency Analysis ("REA"), which is a replacement or equivalency cost method for calculating damages. Damages based upon a REA model are calculated by determining the cost of an equivalent action that provides the same or similar benefits as an impacted resource. Meyer found no market existed for Plaintiff's cultural resources and no similar markets existed nearby. He opined that REA is the only viable method for calculating damages in this case. Plaintiff's modified REA included three steps: (1) identification of the impacted cultural resources and how the impacts affect their potential usage for the Quechan people; (2) utilizing an elicitation process with tribal leaders, Quechan's Cultural Committee and Tribal Council members to determine equivalent actions proportionate to the damages incurred[3]; and (3) a determination of the costs of the equivalent actions[4]. The elicitation process began with the Tribe describing the value associated with the damaged cultural resources as both active uses - including recreation, spiritual relations to the people who lived there in the past, and physically going to the sites - and passive uses including the Quechan's perception of who they are based on the existence of these resources and the knowledge that those resources will be there for future generations. After considering a number of potential equivalency actions, Meyer and Plaintiff's Cultural Committee arrived at programs for cultural learning, involving language training, classes for cultural songs and dances, traditional arts and crafts, and educating tribal members on the cultural features that remain.

In addition to rebutting the appropriateness of Plaintiff's REA assessment[5], Defendant challenged the scale and costs of equivalency damages as disproportionately

---

[2] Meyer has prior experience serving as a retained consultant for the United States Department of Justice in cases involving damage to tribal resources and as a retained consultant for other tribes.

[3] During the elicitation process, tribal members were not made aware of the actual costs associated with the to be discussed equivalency projects.

[4] Meyer relied on a museum expert to estimate the cost of construction for a museum or cultural center.

[5] The testimony of Defendant's REA rebuttal expert challenged Meyer's testimony, focusing on the traditional REA analysis – replacing a pelican for a lost pelican. However, he conceded that a modified

excessive. Defendant also argued Plaintiff's decision to proceed with the construction of a casino project where other cultural resources were later found contradicted Plaintiff's opinion of the value of lost cultural resources and supported mitigation of a damages award.

In addition, Defendant set forth a variety of methodologies for measuring damages in this case, including the purchase price of land containing similar cultural resources outside the Fort Yuma Reservation and utilizing the Archeological Resources Protection Act ("ARPA") to calculate a penalty for the destruction of or damage to the natural resources. Plaintiff asserted the market value of off-Fort Yuma Reservation land, having no historical or cultural significance to the Quechan is not a comparable value of the subject cultural resources. Plaintiff further asserted the ARPA was inappropriate because the ARPA does not authorize private right of actions, Plaintiff did not plead ARPA as a remedy, the ARPA model has never been employed by the federal government as a model to assess damages to natural resources or tribal resources and the proposed methodology did not consider the archaeological value of the affected sites which was inconsistent with an ARPA-related analysis.

After hearing the testimony, the matter was continued to allow the parties, upon Plaintiff's unopposed request, to file detailed closing arguments by way of post-trial briefs. The Court took the matter under submission. Having considered the testimony at trial and the parties' post-trial briefs, this Court makes the following findings of fact and conclusions of law:

**FINDINGS OF FACT**

1. The Tribe sued the United States on its own behalf and as *Parens Patriae* on behalf of its members, to recover full compensation for damage and adverse impacts to cultural resources found by this Court to have been caused by the United States.

---

REA approach that included consultation with the tribal population where a rigorous, strict quantitative, off-the-shelf REA approach would not apply would be appropriate in light of the complex circumstances involving a loss of cultural resources.

2.  In an order dated September 24, 2014, the Court found Defendant liable for negligence, negligence *per se*, trespass and public and private nuisance for damage caused to Sites 689, 7138, 7140, 7141, 7142, 7144, 7147, 7151, 7152, 7153.
3.  Quechan links cultural, spiritual, historical and educational significance to the cultural sites.
4.  The value afforded these sites is not sentimental in nature but, rather, it is based upon customs and traditions.
5.  The impact upon the cultural resources reduces the ability of the Quechan population to practice and preserve their culture.
6.  The impacted sites cannot be restored or repaired, and equivalent cultural resources cannot be purchased in the marketplace.
7.  The cultural resources at issue lack any commercial or market value. In light of the Tribe's cultural heritage and values, it rejected any attempt to monetize the resources by charging admission fees, parking fees, gate fees or by operating a gift shop by way of inviting the public to view the sacred sites.
8.  Land containing clearing circles and other similar resources located outside of but in the vicinity of the Fort Yuma Indian Reservation that has no demonstrated connection to or origin, history or cultural affiliation with Plaintiff falls short of an adequate, alternative remedy.
9.  Defendant's contention that providing Plaintiff the purchase price for off-reservation land that has no established or known cultural resources-relatedness to Plaintiff's cultural history, does not comport with reason or common sense as to the damage to Plaintiff's cultural resources or a reasonable comparable or compensable alternative for damages purposes.
10. The ARPA-based model, which fails to include any archaeological value to the damaged resources, is not an appropriate one to utilize for the damages assessment of the impacts to the Tribe's cultural resources.

11. Elicitation procedures performed by Plaintiff's expert Meyer with tribal leaders, Cultural Committee members and Tribal Council members were appropriate to understand the extent of the tribal members' ownership of their cultural heritage and cultural values.

12. After Defendant's damage to the subject sites and prior to entering into a casino project contract, which was proposed to be constructed on a completely different and separate area of the Fort Yuma Indian Reservation, Plaintiff held a public meeting and a Tribal referendum on the proposed project.  The Tribe's Construction Committee and Cultural Committee discussed the project.  The nature of the vigorous debate relating to this proposed project was indicative of the significance and historical importance of Quechan cultural resources among the tribal members.

13. After the casino construction project was underway, previously unknown cultural resources were unearthed.  Plaintiff's Construction Committee and Cultural Committee immediately took precautions to protect the impacted area, including retaining an archeological firm to perform a cultural resource survey, modifying and re-orienting the casino's design to avoid newly identified cultural resources, developing and providing a Cultural Resources Development Plan to the contractor and required the plan's inclusion in the construction contract. The Tribe also engaged tribal members to monitor the work relating to onsite excavation to ensure protection of the resources.

14. Plaintiff also required the contractor to preserve tribal sacred soil located at Old Borrow Pit, by precluding the contractor from removing and utilizing the materials located on the site as fill dirt as the contractor originally proposed.

15. The protective undertakings caused a costly five-month work stoppage, and substantially increased Plaintiff's cost on the overall contract.

16. Plaintiff's diligent actions to protect its cultural resources were also exhibited by conducting additional surveys in August 2002, leading to the discovery of additional cultural sites located outside the proposed construction's footprint.

17. Plaintiff attempted to preserve most, if not all, uncovered resources known to it under the circumstances. There is no evidence the cultural site found on the proposed construction footprint was known to Plaintiff before undertaking the initial planning of the site of the casino.

18. The outcome of the Tribal referendum relating to the casino construction project, in and of itself, is neither indicative of a loss of respect for cultural values of sacred lands nor a significant factor in the assessment of damages. As such, the result of the vote is not indicative of the import of Plaintiff's valuation of the subject sites, but rather indicative of its interest in attaining and preserving all of its cultural resources.

19. Under the circumstances, the discovery of the cultural resources at the original casino site, the protective actions undertaken by Plaintiff, including the extensive surveying efforts to identify additional resources and protecting other resources based upon input from surveyors, along with the modification of the casino site and attendant contract adjustments and costs, do not support a substantial mitigation of equivalent costs for the damage to impacted sites.

## CONCLUSIONS OF LAW

1. California law governs the measure of damages in this action brought under the Federal Tort Claims Act.

2. Under California Civil Code Section 3333, the measure of damages for the breach of an obligation not arising from contract, "is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."

3. The general rules relating to market value as a method for calculating damages present an inadequate model for damages in this case. The cultural resources have no ascertainable market value.

4. Under California Evidence Code Section 823, "the value of property for which there is no relevant, comparable market may be determined by any method of valuation that is just and equitable."

5. The lack of traditional measures of market value does not limit Plaintiff's recovery for impacts to its cultural resources. *See Heninger v. Dunn,* 101 Cal.App.3d 858, 862 (1980).

6. Equivalent remedial actions are appropriate when cultural resources are lost or impacted and identical resources cannot be created. *See United States v. Union Pac. R.Co.*, 565 F.Supp.2d 1136, 1143 (E.D.Cal. 2008) ("[T]his court must consider. . .the unique character of the [property] at issue.")

7. The REA's three-step analysis is appropriately undertaken to determine actions to compensate for damage to the impacted sites and is a cognizable metric for the analysis in this case.

8. A reasonably-sized museum/cultural learning center and cultural learning staff are equivalent resources that provide preservation and practice of the Quechan culture.

9. A structure less than 10,000 square feet appropriately staffed would sufficiently compensate Plaintiff for the damage caused to its cultural resources.

10. The equivalency costs that represent damages in this case are: 1) the construction of one museum or cultural center at a cost of $2,800,000; 2) a Cultural Resources Director and Lead Cultural Instructor at an annual salary of $62,981; 3) two Cultural Instructors, each having an annual salary of $29,665; and 5) a Museum Caretaker having an annual salary of $27,464.  The personnel operating costs shall be based upon a present value amount beginning in 2015 at a 1.4 percent discount rate carried forward for fifty (50) years.

11. Under the modified REA approach utilized to account for damages here, these are reasonable equivalent resources that will provide for the preservation and continued practice of the Quechan culture and will justly and equitably address the significant overall damage to the impacted sites.

12. Under California Civil Code Section 3288, this Court has discretion as the trier of fact to award prejudgment interest in causes of action for breach of an obligation not arising from contract, and in cases of oppression, fraud, or malice.

13. In light of the operating costs being calculated based upon a present value from 2015 over a 50-year period with a discount rate of 1.4 percent in addition to the one-time cost of construction of the museum or cultural center of $2,800,000, a traditional damages model that includes prejudgment and post-judgment interest is not appropriate.

## CONCLUSION AND ORDER

Based on the Court's findings of fact and conclusions of law, IT IS HEREBY ORDERED:

1. The parties shall meet and confer as to the total amount of recovery based upon the equivalency findings identified herein.

2. The parties shall file a joint stipulation on all damage calculations agreed upon or file briefs of no more than five (5) pages as to matters where there is no agreement **on or before July 11, 2024**.

3. A telephonic conference will be held before this Court on **July 17, 2024 at 2:30 p.m.** Court staff will contact the parties in advance of the hearing to provide instructions to participate.

DATED:   June 13, 2024

_____
JOHN A. HOUSTON
United States District Judge